## FAIRFAX'S DEVISEE v. HUNTER'S LESSEE. 1812.

Feb. 27th.

*Absent....*MARSHALL, *Ch. J. and* WASHINGTON, *J.*

THIS was a writ of error to the Court of appeals Lord Fairf
of Virginia in an action of ejectment involving the con- at the time

FAIRFAX's DEVISEE v. HUNTER's LESSEE.

struction of the treaties between Great Britain and the United States, the judgment of the Court of appeals being against the right claimed under those treaties.

The state of the facts, as settled by the case agreed, was as follows:

his death, had the absolute property, seizen and possession of the waste and unappropriated lands in the Northern Neck of Virginia. An alien enemy may take lands in Virginia by devise, and hold the same until office found. The commonwealth of Virginia could not grant the unappropriated lands in the Northern Neck until its title should have been perfected by possession; & the British treaty of 1794 confirmed the title to those lands in the devisee of lord Fairfax.

1. The title of the late lord Fairfax to all that entire territory and tract of land, called the Northern Neck of Virginia, the nature of his estate in the same as he inherited it, and the purport of the several charters and grants from the kings Charles II and James II, under which his ancestor held, are agreed to be truly recited in an act of the assembly of Virginia, passed in the year 1736, [*vide Rev. Code, v.* 1*, ch.* 3*, p.* 5] "for the confirming and better securing the titles to lands in the Northern Neck, held under the right honorable Thomas lord Fairfax," &c.

From the recitals of the act, it appears that the first letters patent (1 Car. 2.) granting the land in question to Ralph lord Hopton and others, being surrendered in order to have the grant renewed with alterations, the earl of St. Albans and others (partly survivors of, and partly purchasers under the first patentees) obtained new letters patent (2d Car. 2,) for the same land and appurtenances, and by the same description, but with additional privileges and reservations, &c.

The estate granted is described to be, "*All that entire tract, territory or parcel of land, situate, &c. and bounded by, and within the heads of the rivers Tappahannock, &c. together with the rivers themselves, and all the islands, &c. and all woods, underwoods, timber, &c. mines of gold and silver, lead, tin, &c. and quarries of stone and coal, &c. to have, hold, and enjoy the said tract of land, &c. to the said* [*patentees*] *their heirs and assigns forever, to their only use and behoof, and to no other use, intent or purpose whatsoever.*"

There is reserved to the crown, the annual rent of 6*l.* 13*s.* 4*d.* "in lieu of all services and demands whatsoever;" also one fifth part of all gold, and one tenth part of all silver mines.

To the absolute title and seizin in fee, of the land and its appurtenances, and the beneficial use and enjoyment of the same, assured to the patentees, as tenants *in capite*, by the most direct and abundant terms of conveyancing, there are superadded, certain collateral powers of baronial dominion; reserving, however, to the governor, council and assembly of Virginia, the exclusive authority in all the military concerns of the granted territory, and the power to impose taxes on the persons and property of its inhabitants for the public and common defence of the colony, as well as a general jurisdiction over the patentees, their heirs and assigns, and all other inhabitants of the said territory.

In the enumeration of privileges specifically granted to the patentees, their heirs and assigns, is, "*freely and without molestation of the king, to give, grant, or by any ways or means, sell or alien all and singular, the granted premises, and every part and parcel thereof, to any person or persons being willing to contract for or buy the same.*"

There is also a condition to avoid the grant, as to so much of the granted premises as should not be possessed, inhabited or planted by the means or procurement of the patentees, their heirs or assigns, in the space of 21 years.

The third and last of the letters patent referred to, (4 Jac. 2.) after reciting a sale and conveyance of the granted premises by the former patentees, to Thomas lord Culpeper, "*who was thereby become sole owner and proprietor thereof in fee simple,*" proceeds to confirm the same to lord Culpeper, in fee simple, and to release him from the said condition, of having the lands inhabited or planted as aforesaid.

The said act of assembly then recites, that Thomas lord Fairfax, heir at law of lord Culpeper, had become "*sole proprietor of the said territory, with the appurtenances, and the above recited letters patent.*"

By another act of assembly, passed in the year 1748, [*Rev. Code, v. 1. ch. 4, p. 10*] certain grants from the crown, made while the exact boundaries of the North

FAIRFAX'S DEVISEE v. HUNTER'S LESSEE.

ern Neck were doubtful, for lands which proved to be within those boundaries, as then recently settled and determined, were, with the *express consent* of lord Fairfax, confirmed to the grantees; to be held, nevertheless of him, and all the rents, services, profits and emoluments, (reserved by such grants) to be paid and performed to him.

In another act of assembly, passed May, 1779, for establishing a land office, and ascertaining the terms and manner of granting waste and unappropriated lands, there is the following clause, viz.: [vide Chy. Rev. of 1783, ch. 13, s. 6, p. 98] "And that the proprietors of land within this commonwealth, may no longer be subject to any servile, feudal or precarious tenure; and to prevent the danger to a free state from perpetual revenue; Be it enacted, That the royal mines, quit rents, and all other reservations and conditions in the patents or grants of land from the crown of England, under the former government, shall be, and are hereby declared null and void; and that all lands, thereby respectively granted, shall be held in absolute and unconditional property, to all intents and purposes whatsoever, in the same manner with the lands hereafter to be granted by the commonwealth, by virtue of this act."

2d. As respects the actual exercise of his proprietary rights by lord Fairfax.

It is agreed that he did, in the year 1748, open and conduct, at his own expense, an office within the Northern Neck, for granting and conveying what he described and called the *waste* and *ungranted lands* therein, upon certain terms, and according to certain rules by him established and published; that he did, from time to time, grant parcels of such lands in fee; (the deeds being registered at his said office, in books kept for that purpose, by his own clerks and agents) that according to the uniform tenor of such grants, he did, styling himself *proprietor* of the Northern Neck, &c. in consideration of a certain composition to him paid, and of certain annual rents therein reserved, grant, &c.; with a clause of re-entry for non-payment of the rent, &c.; that he also demised, for lives and terms of years,

parcels of the same description of lands, also reserving annual rents; that he kept his said office open for the purposes aforesaid, from the year 1748, till his death in December, 1781; during the whole of which period, and before, he exercised the right of granting, in fee, and demising for lives and terms of years as aforesaid; and received and enjoyed the rents annually, as they accrued, as well under the grants in fee, as under the leases for lives and years. It is also agreed that lord Fairfax died seized of lands in the Northern Neck, equal to about 300,000 acres, which had been granted by him in fee, to one T. B. Martin upon the same terms and conditions, and in the same form, as the other grants in fee before described; which lands were, soon after being so granted, reconveyed to lord Fairfax in fee.

3d. Lord Fairfax being a citizen and inhabitant of Virginia, died in the month of December, 1781; and by his last will and testament, duly made and published, devised the whole of his lands, &c. called or known by the name of the Northern Neck of Virginia, in fee to Denny Fairfax, (the original Defendant in ejectment) by the name and description of the reverend Denny Martin, &c. upon condition of his taking the name and arms of Fairfax, &c. and it is admitted that he fully complied with the conditions of the devise.

4th. It is agreed that Denny Fairfax, the devisee, was a native born Britith subject, and never became a citizen of the United States, nor any one of them; but always resided in England; as well during the revolutionary war, as from his birth about the year 1750, to his death, which happened some time between the years 1796 and 1803, as appears from the record of the proceedings in the Court of Appeals.

It is also admitted that lord Fairfax left, at his death, a nephew named Thomas Bryan Martin, who was always a citizen of Virginia, being the younger brother of the said devisee, and the second son of a sister of the said lord Fairfax; which sister was still living, and had always been a British subject.

5th. The land demanded by this ejectment, being

FAIRFAX's DEVISEE v. HUNTER's LESSEE.

agreed to be part and parcel of the said territory and tract of land, called the Northern Neck, and to be a part of that description of lands, within the Northern Neck, called and described by lord Fairfax, as "*waste and ungranted;*" and being also agreed never to have been escheated and seized into the hands of the commonwealth of Virginia, pursuant to certain acts of assembly concerning escheators, and never to have been the subject of any inquest of office, was contained and included in a certain patent, bearing date the 30th April, 1789, under the hand of the then governor, and the seal of the commonwealth of Virginia, purporting that the land in question, is granted by the said commonwealth unto David Hunter [the lessor of the Plaintiff in ejectment] and his heirs forever, by virtue and in consideration of a land office treasury warrant, issued the 23d January, 1788. The said lessor of the Plaintiff in ejectment is, and always has been a citizen of Virginia; and in pursuance of his said patent entered into the land in question, and was thereof possessed, prior to the institution of the said action of ejectment.

6th. The definitive treaty of peace concluded in the year 1783, between the United States of America and Great Britain, and also the several acts of the assembly of Virginia, concerning the premises, are referred to as making a part of the case agreed.

*Treaties and acts of assembly referred to.*

*Provisional articles of peace between Great Britain and the United States, concluded 30th November, 1782, Art. 5 and 6.*

*Definitive treaty of peace between the same powers, concluded 3d September, 1783, Art. 5 and 6.*

*Treaty of amity, &c. between the same powers, concluded 19th November, 1794, Art. 9.*

"*An act respecting future confiscations.*" (*Oct. 1783.*)

"Whereas it is stipulated, by the sixth article of the treaty of peace between the United States and the king of Great Britain, that there shall be no future confisca-

tions made; *Be it enacted*, That no future confiscations shall be made, any law to the contrary notwithstanding; provided, that this act shall not extend to any suit, depending in any Court, which was commenced prior to the ratification of the treaty of peace."

"*An act declaring who shall be deemed citizens of this commonwealth.*" [*May, 1779, ch. 55, repealed.*]

"*An act for sequestering British property,*" *&c.* [*Oct. 1777, ch. 9. vid. Chy. Rev. p. 64.*] All the property and estate whatsoever of *British subjects* is, by this act, sequestered into the hands of commissioners of sequestration, by them to be preserved, according to certain regulations, for the purpose of being restored or otherwise dealt with, according as the king of Great Britain should act towards the property of citizens of the commonwealth, in the like circumstances. The preamble declaring that inasmuch as the British sovereign was not yet known to have set the example of confiscation, "*the public faith and the law and usages of nations,*" required the like forbearance on our part.

"*An act concerning escheats and forfeitures from British subjects,*" [*May, 1779, ch. 14. vid. Chy. Rev. p. 98:*] After reciting the former act, and that it had been found that the property, so sequestered, was liable to be wasted, &c. and that from the advanced price at which it would then sell, it would be most for the benefit of the former owners, in the event of i s being thereafter restored, or of the public, if not so restored, that the sale should take place immediately, &c. repeals so much of the former act, as was supposed to have suspended the operation of the laws of escheat and forfeiture, and then declares that all the property, real and personal within the commonwealth, belonging, *at the time of passing the act*, to any British subject, "shall be *deemed to be vested* in the commonwealth; the lands, slaves and other real estate by way of *escheat*, and the personal estate by forfeiture." The proceedings on inquests of office, for the purposes of escheat under this act, are prescribed. The duties of escheator are directed to be performed, in the Northern Neck, by the sheriffs of counties. Section 3 declares who shall be deemed British subjects within the meaning of the act:

FAIRFAX'S DEVISEE v. HUNTER'S LESSEE.

"first, All persons, subjects of his Britannic Majesty, who, on the 19th April, 1775, when hostilities commenced at Lexington, between the United States of America, and the other parts of the British empire, were resident or following their vocations in any part of the world, other than the said United States, and have not since, either entered into public employment of the said states, or joined the same, and by overt act adhered to them," &c. &c.

*An act to amend the aforegoing*, [*Oct.* 1779, *ch.* 18, *id. p.* 110,] Directs the modes of proceeding in inquests of office, traverse of office and *monstrans de droit*, as well by British subjects as others.

"*An act concerning escheators*," [*May*, 1779, *ch.* 45, *id. p.* 106, *Oct.* 1785, *ch.* 63, *p.* 52. *vid. Rev. Code, v.* 1, *p.* 126,] Directs the appointment of an escheator for every county, except the counties in the Northern Neck; his qualification, duties, &c. proceedings on inquests of office, traverse and *montrans de droit*, &c. &c. prohibits the granting of any lands, seized into the hands of the commonwealth upon office found, till the lapse of twelve months after the return of the inquisition and verdict, into the office of the General Court: if no claim be made within that period, or being made, shall be found and discussed for the commonwealth, the clerk of the General Court is, within two months thereafter, to certify the fact to the proper escheator, who is, thereupon, to proceed to sell.

"*An act to extend the operation of the foregoing act, to the counties of the Northern Neck*." [1785, *ch.* 53, *p.* 37.]

"*An act to amend and reduce into one, the several acts for ascertaining certain taxes, establishing a permanent revenue*," *&c.* [*Oct.* 1782, *ch.* 8, *sec.* 24.—*vide Chy. Rev. p.* 176,] Sequesters, in the hands of persons holding lands in the Northern Neck, all quit rents then due, until the right of descent shall be more fully ascertained, and the general assembly shall make *final provision* thereon; and all quit rents thereafter to become due, shall be paid into the public treasury, under the operation of the laws of that session; for which quit

rents, the inhabitants of the Northern Neck shall be exonerated from the *future claim of the proprietor.*

"*An act concerning surveyors,*" [*Oct. 1782, ch. 33, sec. 3—vide id. p.* 180.] Recites that the death of lord Fairfax may occasion great inconvenience to those inclined to make entries for vacant lands in the Northern Neck; provides that all entries made with the surveyors of the counties in the Northern Neck, and returned to the office formerly kept by lord Fairfax, shall be deemed as good and valid in law, as those made under his direction, until *some mode* shall be taken up and adopted by the general assembly, concerning the territory of the Northern Neck.

"*An act for safe keeping the land-papers of the Northern Neck,*" [*October, 1785, ch. 63, p. 36,*] Reciting that it was customary to keep the records, &c. of lands within the Northern Neck, in the office of the late proprietor, and that it was necessary that the records on which the titles to lands depended, should be all kept in one office; provides for the removal of the same into the register's office, &c.

Also, provides for issuing grants for surveys, under entries made in the life of the proprietor, and under entries made with surveyors, pursuant to the act last above recited; declaring them to be cases *till then unprovided for.*

Sec. 5. Subjects the *unappropriated* lands, within the district of the Northern Neck, to the same regulations, and to be granted in the same manner, as is by law directed in cases of *other unappropriated* lands belonging to the commonwealth.

Sec. 6. Forever, *thereafter*, exonerates land holders, within the said district, from composition and quit rents.

"*An act declaring who shall be deemed citizens of this commonwealth,*" [*May, 1779, ch. 55. Repealed.*]

"*An act declaring tenants of lands or slaves in taille, to hold the same in fee simple.*" [*May, 1776, ch. 26, vide Chy. Rev. p.* 45.]

*An act to amend the foregoing*, [*October*, 1783, *ch.* 27, *vide id. p.* 204.] Lands or slaves, which, by virtue of the former act, have, or shall become *escheatable* to the commonwealth, for defect of blood, shall descend, and be deemed to have descended, agreeable to the limitations of the deed or will creating such estates: Provided, this act shall not extend to any lands or slaves *escheated* and sold for the use of the commonwealth.

C. Lee *and* Jones, *on the part of the Plaintiff in error, contended,*

1st. That lord Fairfax was, at his death, seized of an absolute and unconditional estate of inheritance in the whole of that description of land, within the boundaries of his letters patent, designated by him as "waste and ungranted;" that is to say, in all the lands within those boundaries, except such as had been parcelled out into tenements, and granted in fee, by himself or his ancestors, or predecessors, or by his or their consent or authority; and that he was in the actual seizin and possession of the soil, with the like title to the immediate pernancy and fruition of the profits, and under the like sanctions, as ordinary proprietors in fee, under grants derived from the crown prior to the revolution.

2d. That the estate, by virtue of the will of lord Fairfax, vested in Denny Fairfax, the devisee, and has never been divested out of him by office found and seizure, nor by any equivalent mode of confiscation whatsoever; and that the treaty of peace found him seized of the estate unaltered from the condition in which it was originally taken under the devise.

3d. That the treaty of peace prohibited the confiscation of the estate, whether by inquest of office, or by any other mode whatsoever; and so operated a release and confirmation to the British proprietor, whose title was again explicitly acknowledged and confirmed by the treaty of 1794; which completely removed every incapacity and disability that might possibly be supposed to remain in him, as a landed proprietor.

4th. That the patent, under which the Defendant in error claims the land in question, was not authorized by any

pre-existing law of Virginia, but was in direct contravention of the treaty of peace, and of the statute of Virginia, enacted expressly in execution of the treaty, and strictly enjoining the observance of its stipulations with good faith: and, therefore, the said patent conveys no title to the Defendant in error.

1. Upon the first point they relied upon the express words of the grant, from the crown to the original patentees, and the following cases: 2, *Wash.* 113, *Picket v. Dowdall*—*id.* 120, *Johnson v. Buffington*—*id.* 125, *Curry v. Burns*—1, *Wash.* 34, *Birch v. Alexander*—and 2, *Dall.* 99, *M'Curdy v. Potts.*

2. The estate, by the devise, vested in Denny Fairfax, who continued to hold the same till the treaty of peace. Although an alien enemy, he could take and hold until office found. The law is perfectly settled that an alien can take by purchase, although he cannot take by descent. In this respect there is no difference between an alien enemy and an alien friend. He took a fee simple subject to the right of the sovereign to seize it. *Co. Lit.* 2, (*b*)—5, *Co.* 52, *Page's case*—9. *Co.* 141 (*a*)—2, *Bl. Com.* 293, *Powell on dev.* 316—2, *Vent.* 270.

It is essential to the Plaintiffs title that the estate should have vested in Denny Fairfax, for if it did not, it could not escheat to the commonwealth under whom the Plaintiff claims.

It is one of the principles of the common law, upon which the security of private property from the grasp of power depends, *that the crown can take only by matter of record.* 3, *Bl. Com.* 259. Those authorities which say an alien may take, *but cannot hold,* clearly mean that he cannot hold *against the claim of the crown* asserted in a legal manner—*Co. Lit.* 2, *a* & *b*. An alien may suffer a common recovery—*Goldsb.* 102. 4, *Leon,* 82. *Bro. tit. Denizen and Alien,* 17. And it is expressly laid down that only the tenant of the freehold can suffer a common recovery—3, *Bl. Com.* 356-7. But he could not be tenant of the freehold unless the estate vested and *remained* in him—1, *Bac. ab.* 133. The case of an alien purchasing and being afterwards made a

FAIRFAX's DEVISEE v. HUNTER's LESSEE.

denizen is very strong, for in that case, although the lands be forfeitable they descend. This could not be if the estate did not remain in the alien from the time of his purchase till his becoming a denizen. It is also laid down that if an alien and a subject purchase jointly, the estate will survive upon the death of the alien, unless office be found, consequently the estate remained in the alien until his death. It is expressly decided in *Page's case, 5, Co.* 52, that until office found, nothing vests in the king. *Nichol's case, 2, Plowden*, 481, 486. 2, *Vez.* 539, *Duplessis's case*—4, *Co.* 58, *Sadler's case.*

In this case no office was found, nor any equivalent act done to vest the estate in the commonwealth before the treaty of peace, of 1783. The only act on the subject passed in 1782, *ch.* 33, *sec.* 3—*Chancery revisal*, 180. This manifests no intention to confiscate. On the contrary by making the entries for lands in the Northern Neck returnable to the former office of lord Fairfax, the legislature show a disposition not to molest his title.

The treaty of peace then found the freehold of the land in Denny Fairfax.

3. That treaty released the forfeiture and no subsequent act of the legislature could affect the title.

The 5th article engages that Congress shall earnestly recommend the restoration of confiscated estates; and the 6th article stipulates that " no further confiscation shall be made."

The term "*confiscation*" embraces every case of the money or estate of an individual, brought into the treasury in virtue of any forfeiture; and in this sense it is generally used in treaties. *Cowell Tit. confiscation*, 1, *W. Bl.* 183. 3. *Dall.* 234. 1, *Bl. Com.* 299.

Lands acquired by an alien are, on that account, liable to forfeiture. 1, *Bl. Com.* 372—2, *Bl. Com.* 274. Escheat is one mode of confiscation. *Confiscation law of Virginia*, 1779. 2, *Bl. Com.* 243, 244, 252, 272, 293.

The 5th article of the treaty illustrates the 6th. Why should congress recommend the restoration of confis-

cated estates belonging to real British subjects, if they were to be immediately taken back upon the plea of alienage? If an estate had been thus restored to a British subject under the 5th article, the 6th would have protected him in the enjoyment of it, or the 5th would have been wholly nugatory. There was no provision, in the treaty, to protect restored estates, but the prohibition of future confiscations contained in the 6th artitle. If in one case the term, *confiscation*, in that article, meant confiscation by reason of that alienage which was the consequence of the part taken in the war, why not give it the same meaning in all cases of alienage arising from the same cause? Denny Fairfax became an alien by reason of the part he took in the war. He chose to take part with Great Britain, and thereby became an alien, whereby his land became liable to confiscation according to the laws of Virginia. Whether the confiscation was to be mediately or immediately the consequence of the part taken in the war, was immaterial. It would have been a "*future* confiscation by reason of the part taken by him in the war." Any subsequent act of confiscation therefore by the state of Virginia, would have been void as being contrary to the express stipulation of the treaty. *Thomas Parker's Rep.* 267, 161, *Co. Lit.* 2, *(b) Hargrave's note* 4.

The treaty of 1794, is merely declaratory of the effect of the treaty of peace. It makes no new provision.

HARPER, *contra*.

1. As to the nature of lord Fairfax's title to the waste and unappropriated lands.

This title was not that of a common subject. It was a grant by the crown, of the same right to dispose of the lands which the sovereign had. It was a right to grant the lands to individuals, and to receive the services and quitrents due therefor. It was not contemplated that he himself should occupy the lands. It was a mere delegation of a part of the sovereign power, and so far as it was executed by him, it passed, with the other rights of sovereignty, to the commonwealth of Virginia, at the time of the revolution.

This was the construction put upon it by lord Fairfax himself—for when he intended to appropriate any part of the lands to his own use, he granted it to a third person, and then took back the title from his own grantee. His deeds were not in the common form, but were made to resemble those of the crown.

The Defendants in error still contend that there is a difference between an alien friend and an alien enemy, as to the right to hold lands. In the latter case an office is not necessary. The right and possession are both thrown upon the commonwealth.

3. But the principal question is, what effect had the treaty of peace upon this devise?

It is said that the provision, that no future confiscations should be made, removes the disability of alienage.

The *title* of the commonwealth of Virginia was complete before the treaty of peace. Nothing more was necessary than to pursue the legal proceedings to put the state into *possession.* The office is no part of the title. This was complete at the death of lord Fairfax. It vested *eo instanti* in the commonwealth. If it passed to Denny Fairfax, it was to the use of the commonwealth. But if any title vested in Denny Fairfax, what kind of title was it? It could not descend from him. Upon his death the right and possession were cast upon the commonwealth. He had no beneficial interest. He was only a trustee of an estate at will—*Co. Lit.* 2, (*b*) *Plowd.* 229. An office is only a suit brought by the king to establish his title by proof of the facts upon which his title depends. It is not to *give title*, but to prove the fact of alienage. The office is the remedy, not the right. It is only the means of gaining possession. Attornment to an alien is an attornment to the use of the king—*Co. Lit.* 310, (*b.*)

An alien cannot sell, *Co. Lit.* 42, (*b.*) He has nothing but a naked possession. It is said he is a good tenant to the *precipe*, and may suffer a common recovery; but it is for the use of the king.

The treaty of peace does not protect the title.

Confiscation does not mean the recovery of a debt, or of any thing to which the state had a right before; but it is the assumption of a new right. The creation of a right by an act of sovereign power. It is a transfer, not of property, but of the right of property, from individual to public use. But here the right existed before.

If this be not the general meaning of the word "*confiscation*," it is the meaning of it as used in the treaty. The contracting parties were speaking of the acts of the state governments which were intended as punishments for the part which certain persons had taken in the war. The estates to be restored were not such as had escheated by reason of alienage, but such as had been confiscated on account of the part taken in the war.

If the *title* was not protected by the treaty, then upon the death of Denny Fairfax it vested completely in the commonwealth. The Fairfax title was extinct. The commonwealth was estopped by its deed from claiming it, so that the title of Hunter was unquestionable.

As to the 9th article of the treaty of 1794, Denny Fairfax could continue to hold only what he then held, and *as* he then held. If he held any thing, it was, at most, an estate for life, remainder to the commonwealth in fee defeasible, during his life, by office found. Consequently, at his death, the commonwealth had an estate in fee. The treaty of 1794 was intended to protect those only who became aliens, by the separation of the two countries, while they held the estates, and not those who were aliens when their estates accrued. If it had intended to protect the latter class, it would have protected estates acquired by descent as well as those acquired by devise: for they are both within the same reason, yet it cannot be said that an alien, who, but for his alienage, would have inherited an estate upon a descent cast before 1794, is benefitted by that treaty. It cannot be said that he *then held* the estate of his ancestor which his alienage had prevented from descending upon him.

*March 15th*, 1813. The Court having taken time since last term to consider this case,

FAIRFAX'S DEVISEE v. HUNTER'S LESSEE.

STORY, *J.* delivered their opinion as follows, (MARSHALL *Ch. J. and* TODD *J. being absent.*)

The first question is, whether lord Fairfax was proprietor of, and seized of the soil of the waste and unappropriated lands in the Northern Neck, by virtue of the royal grants, 2 *Charles,* 2 *and* 4 *James* 2, or whether he had mere seignoral rights therein as lord paramount, disconnected from all interest in the land, except of sale or alienation.

The royal charter expressly conveys all that entire tract, territory, and parcel of land, situate, &c. together with the rivers, islands, woods, timber, &c. mines, quarries of stone and coal, &c. to the grantees and their heirs and assigns, to their only use and behoof, and to no other use, intent or purpose whatsoever.

It is difficult to conceive terms more explicit than these to vest a title and interest in the soil itself. The land is given, and the exclusive use thereof, and if the union of the title and the exclusive use do not constitute the *dominium directum & utile,* the complete and absolute dominion in property, it will not be easy to fix any which shall constitute such dominion.

The ground of the objection would seem to have been, that the royal charter had declared that the grantees should hold of the king as *tenants in capite,* and that it proceeded to declare that the grantees and their heirs and assigns should have power "freely and without molestation of the king, to give, grant, or by any ways "or means sell or alien all and singular the granted "premises, and every part and parcel thereof, to any "person or persons being willing to contract for and "buy the same," which words were to be considered as restrictive or explanatory of the preceding words of the charter, and as confining the rights granted to the mere authority to sell or alien.

But it is very clear that this clause imposes no restriction or explanation of the general terms of the grant. As the grantees held as tenants *in capite* of the king, they could not sell or alien without the royal license, and if they did, it was in ancient strictness an

absolute forfeiture of the land. 2 *Ins.* 66; and after the statute 1 *Edw.* 3 *ch.* 12, though the forfeiture did not attach, yet a reasonable fine was to be paid to the king upon the alienation. 2 *Ins.* 67. *Staundf. Prer.* 27. 2 *Bl. Com.* 72. It was not until ten years after the first charter, (12 *Ch.* 2 *ch.* 24,) that all fines for alienations and tenures of the king *in capite* were abolished. 2 *Bl. Com.* 77. So that the object of this clause was manifestly to give the royal assent to alienations without the claim of any fine therefor.

We are therefore satisfied, that by virtue of the charter and the intermediate grants, lord Fairfax at the time of his death, had the absolute property of the soil of the land in controversy, and the acts of ownership exercised by him over the whole waste and unappropriated lands, as stated in the case, vested in him a complete seizin and possession thereof. Even if there had been no acts of ownership proved, we should have been of opinion, that as there was no adverse possession, and the land was waste and unappropriated, the legal seizin must be, upon principle, considered as passing with the title.

On this point we have the satisfaction to find, that our view of the title of lord Fairfax seems incidentally confirmed by the opinion of the Court of appeals of Virginia, in *Picket v. Dowdell*, 2 *Wash.* 106. *Johnson v. Buffington*, 2 *Wash.* 116, *and Curry v. Burns*, 2 *Wash.* 121.

The next question is as to the nature and character of the title which Denny Fairfax took by the will of lord Fairfax, he being, at the time of the death of lord Fairfax, an alien enemy.

It is clear by the common law, that an alien can take lands by purchase, though not by descent; or in other words he cannot take by the act of law, but he may by the act of the party. This principle has been settled in the year books, and has been uniformly recognized as sound law from that time. 11 *Hen.* 4, 26. 14, *Hen.* 4, 20. *Co. Litt.* 2 *b.* Nor is there any distinction, whether the purchase be by grant or by devise. In either case, the estate vests in the alien. *Pow. Dev.* 316, *&c.* *Park.*

FAIRFAX's DEVISEE v. HUNTER's LESSEE.

*Rep.* 144. *Co. Litt.* 2 *b.* not for his own benefit, but for the benefit of the state; or in the language of the ancient law, the alien has the capacity to *take*, but not to *hold* lands, and they may be seized into the hands of the sovereign. 11 *H.* 4, 26. 14 *H.* 4, 20. But until the lands are so seized, the alien has complete dominion over the same. He is a good tenant of the freehold in a *precipe* on a common recovery. 4 *Leon* 84. *Goldsb.* 102. 10 *Mod.* 128. And may convey the same to a purchaser. *Sheafe v. O'Neile*, 1 *Mass. Rep.* 256. Though *Co. Litt.* 52 *b*, seems to the contrary, yet it must probably mean that he can convey a defeasible estate only, which an office found will divest. It seems indeed to have been held, that an alien cannot maintain a real action for the recovery of lands. *Co. Lit.* 129 *b.* *Thel. Dig. ch.* 6. *Dyer*, 2. *b.* but it does not then follow that he may not defend, in a real action, his title t. the lands against all persons but the sovereign.

We do not find that in respect to these general rights and disabilities, there is any admitted difference between alien friends and alien enemies. During the war, the property of alien enemies is subject to confiscation *jure belli*, and their civil capacity to sue is suspended. *Dyer*, 2 *b.* *Brandon v. Nesbitt*, 6 *T. R.* 23. 3 *Bos. & Pull.* 113. 5 *Rob.* 102 But as to capacity to purchase, no case has been cited in which it has been denied, and in *The Attorney General v. Wheeden & Shales, Park. Rep.* 267, it was adjudged that a bequest to an alien enemy was good, and after a peace might be enforced. Indeed the common law in these particulars seems to coincide with the *Jus Gentium*. *Bynk. Quest. Pub. Jur. ch.* 7. *Vattel*, *b.* 2, *ch.* 8, § 112, 114. *Grot. lib.* 2, *ch.* 6, § 16.

It has not been attempted to place the title of Denny Fairfax upon the ground of his being an *antenatus*, born under a common allegiance before the American revolution, and this has been abandoned upon good reason; for whatever doubts may have been formerly entertained, it is now settled that a British subject born before, cannot, since the revolution, take lands by descent in the United States. 4 *Cranch*, 321, *Dawson's Lessee v. Godfrey*.

But it has been argued, that although D. Fairfax

had capacity to take the lands as devisee, yet he took to the use of the commonwealth only, and had therefore but a momentary seizin; that in fact he was but a mere trustee of the estate at the will of the commonwealth, and that by operation of law, immediately upon the death of the testator, lord Fairfax, the title vested in the commonwealth, and left but a mere naked possession in the devisee.

If we are right in the position, that the capacity of an alien enemy does not differ in this respect from an alien friend, it will not be easy to maintain this argument. It is incontrovertibly settled upon the fullest authority, that the title acquired by an alien by purchase, is not divested *until office found*. The principle is founded upon the ground, that as the freehold is in the alien, and he is tenant to the lord of whom the lands are holden, it cannot be divested out of him but by some notorious act, by which it may appear that the freehold is in another. 1 *Bac. Abr. Alien C. p.* 133. Now an office of entitling is necessary to give this notoriety, and fix the title in the sovereign. So it was adjudged in *Page's case*, 5 *Co.* 22, and has been uniformly recognized. *Park. Rep.* 267. *Park.* 144. *Hob.* 231. *Bro. Denizen, pl.* 17. *Co. Litt.* 2. *b.* And the reason of the difference, why, when an alien dies, the sovereign is seized without office found, is because otherwise the freehold would be in abeyance, as an alien cannot have any inheritable blood. Nay even after office found, the king is not adjudged in possession, unless the possession were then vacant; for if the possession were then in another, the king must enter or seize by his officer, before the possession *in deed* shall be adjudged in him. 14 *H.* 7, 21. 15 *H.* 7, 6. 20. *Staundf. Prerog. Reg. ch.* 18, *p.* 54. 4 *Co.* 58. *a.* And if we were to yield to the authority of *Staundford*, (*Prer. Reg. ch.* 18, *p.* 56,) that in the case of alien enemy, the king "*ratione guerrae*," might seize without office found, yet the same learned authority assures us, "that the king must seize in those cases, ere he can have *an interest* in the lands, because they be penal towards the party." 4 *Co.* 58. *b.* And until the king be in possession by office found, he cannot grant lands which are forfeited by alienage. *Staundf. Pre. Reg. ch.* 18. *f.* 54. *Stat.* 18 *Hen.* 6, *ch.* 6.

To apply these principles to the present case, Denny Fairfax had a complete, though defeasible title, by virtue of the devise, and as the possession was either vacant or not adverse, of course the law united a seizin to his title in the lands in controversy; and this title could only be divested by an inquest of office, perfected by an entry and seizure where the possession was not vacant. And no grant by the commonwealth, according to the common law, could be valid, until the title was, by such means, fixed in the commonwealth. It is admitted that no entry or seizure was made by the commonwealth *"ratione guerrae"* during the war. It is also admitted, that no inquest of office was ever made pursuant to the acts on this subject at any time. And it would seem therefore to follow, upon common law reasoning, that the grant to the lessor of the original Plaintiff, by the public patent of 30th April, 1789, issued improvidently and erroneously, and passed nothing. And if this be true, and there be no act of Virginia altering the common law, it is quite immaterial what is the validity of the title of the original Defendant as against the commonwealth; for the Plaintiff must recover by the strength of his own title, and not by the weakness of that of his adversary.

But it is contended, 1st, That the common law as to inquests of office and seizure, so far as the same respects the lands in controversy, is completely dispensed with by statutes of the commonwealth, so as to make the grant to the original Plaintiff in 1789 complete and perfect—And secondly, and further, if it be not so, yet as the devisee died pending the suit, the freehold was thereby cast upon the commonwealth without an inquest, and thus arises a retroactive confirmation of the title of the original Plaintiff, of which he may now avail himself.—As to the first point we will not say that it was not competent for the legislature, (supposing no treaty in the way) by a special act to have vested the land in the commonwealth without an inquest of office for the cause of alienage. But such an effect ought not, upon principles of public policy, to be presumed upon light grounds; that an inquest of office should be made in cases of alienage, is a useful and important restraint upon public proceedings. No part of the United States seems to have been more aware of its importance, or

more cautious to guard against its abolition, than the Courts of Virginia. It prevents individuals from being harassed by numerous suits introduced by litigious grantees. It enables the owner to contest the question of alienage directly by a traverse of the office. It affords an opportunity for the public to know the nature, the value, and the extent of its acquisitions *pro defectu hæredis*; and above all it operates as a salutary suppression of that corrupt influence which the avarice of speculation might otherwise urge upon the legislature. The common law, therefore, ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose.

Let us now consider the several acts which have been referred to in the argument, from which we think it will abundantly appear that, during the war, the lands in controversy were never, by any public law, vested in the commonwealth. We dismiss, at once, the act of 1777, ch. 9, and of 1779, ch. 14, as they are restrained to estates held by British subjects at the times of their respective enactments, and do not extend to estates subsequently acquired.

The next act is that of 1782, ch. 8, the 24th sec. after reciting that "since the death of the late proprietor of the Northern Neck, there is reason to suppose that the said proprietorship hath descended upon *alien enemies*," enacts, that persons holding lands in said Neck, shall retain *sequestered* in their hands, all quit rents which were then due, *until the right of descent should be more fully ascertained*; and that all quit rents, thereafter to become due, shall be paid into the public treasury, and the parties exonerated from the future claim of the proprietor. Admitting that this section, as to the *quit rents*, was equivalent to an inquest of office; it cannot be extended, by construction, to include the *waste lands* of the proprietor. Neither the words, nor the intention, of the legislature would authorize such a construction—But it may well be doubted if, even as to the *quit rents*, the provision is not to be considered as a sequestration *jure belli*, rather than a seizure for alienage—for it proceeds on the ground, that the property "had descended, not upon aliens, but *alien enemies*. So far as the treaty of peace might be deemed material in the case, this distinction would deserve consideration,"

The next is the act of 1782, ch. 33, which, after reciting that "the death of lord Fairfax may occasion great inconvenience to those who may incline to make entries for vacant lands in the Northern Neck, proceeds (sec. 3.) to enact, that all entries made with the surveyors, &c. and returned to the office formerly kept by lord Fairfax, shall be held as good and valid as those heretofore made under his direction, "until some mode shall "be taken up and adopted by the General Assembly, "concerning the territory of the Northern Neck." This act, so far from containing in itself any provision for vesting all the vacant lands of lord Fairfax in the commonwealth, expressly reserves, to a future time, all decisions as to the disposal of the territory.—It suffers rights and titles to be acquired exactly in the same manner, and with the same conditions, which lord Fairfax had by permanent regulations prescribed in his office.—No other acts were passed on the subject during the war.

We are now led to consider the act of 1785, ch. 47—which has presented some difficulty, if it stand unaffected by the treaty of peace. The 4th sec. after a recital "that "since the death of the late proprietor, no mode hath "been adopted to enable those who had before his "death made entries within the said district according "to an act, &c. (act 1782, ch. 33) to obtain titles to the "same," enacts that in all cases of such entries, grants shall be issued by the commonwealth to the parties in the same manner, as by law is directed in cases of other unappropriated lands—The 5th sec. then declares that the unappropriated lands within the Northern Neck should be subject to the same regulations, and be granted in the same manner, and caveats should be proceeded upon, tried and determined, as is by law directed, in cases of other unappropriated lands belonging to the commonwealth. The 6th sec. extinguishes for the future all quit rents.

The patent of the original Plaintiff issued pursuant to the 5th sec. of this act.

It has been argued, that the act of 1785 amounts to a legislative appropriation of all the lands in controversy. That it must be considered as completely divesting the title of Denny Fairfax for the cause of alienage, and

vesting it in the commonwealth—After the most mature reflection, we cannot subscribe to the argument—In acts of sovereignty so highly penal, it is against the ordinary rule to enlarge, by implication and inference, the extent of the language employed. It would be to declare purposes which the legislature have not chosen to avow, and to create vested estates, when the common law would pronounce a contrary sentence, and the guardians of the public interests have not expressed an intention to abrogate that law. If the legislature have proceeded upon the supposition that the lands were already vested in the commonwealth, we do not perceive how it helps the case. If the legislature, upon a mistake of facts, proceed to grant defective titles, we know of no rule of law which requires a Court to declare, in penal cases, that to be actually done which ought previously to have been done. Perhaps as to grants under the 4th sec. where entries under the act of 1782, ch. 33, it *might not be too much to hold, that such grants* conveyed no more than the title of the commonwealth, exactly in the same state as the commonwealth itself held it, viz. an inchoate right, to be reduced into possession and consummated by a suit in the nature, or with the effect, of an inquest of office. But we give no opinion on this point, because the patent of the original Plaintiff manifestly issued under the succeeding section—and upon a construction, which we give to this section, it issued improvidently and passed no title whatever.—That construction is, that the unappropriated lands in the Northern Neck should be granted in the same manner as the other lands of the commonwealth, *when the title of the commonwealth was perfected by possession.* It seems to us difficult to contend, that the legislature meant to grant mere titles and rights of entry, of the commonwealth, to lands in the same manner as it did lands of which the commonwealth was in actual possession and seizin.—It would be selling suits and controversies through the whole country, and enacting a general statute in favor of maintenance, an offence which the common law has denounced with extraordinary severity. Consistent therefore with the manifest intention of the legislature, grants were to issue for lands in the Northern Neck, precisely in the same manner as for lands in other parts of the state, and under the same

limitation, viz. that the commonwealth should have, at the time of the grant, a complete title and seizin.

We are the more confirmed in this construction by the act concerning escheators, (act 1779, ch. 45,) which regulates the manner of proceeding in cases of escheat, and was by a subsequent act. (act 1785, ch. 53,) expressly extended to the counties in the Northern Neck. This act of 1779 expressly prohibits the granting of any lands, seized into the hands of the commonwealth upon office found, till the lapse of twelve months after the return of the inquisition and verdict into the office of the general Court, and afterwards authorizes the proper escheator to proceed to sell in case no claim should be filed, within that time, and substantiated against the commonwealth. It is apparent, from this act, that it was not the intention of the legislature to dispose of lands, accruing by escheat, in the same manner as lands to which the commonwealth already possessed a perfect title. It has not been denied that the regulations of this act were designed to apply as well to titles accruing upon alienage, (which are not in strictness, escheats,) as upon forfeitures for other causes; and, but for the act of 1785, ch. 47, we do not perceive but that the vacant lands were, by the devise of lord Fairfax, in the Northern Neck, would have been completely within the act regulating proceedings upon escheats.

The real fact appears to have been, that the legislature supposed that the commonwealth were in actual seizin and possession of the vacant lands of lord Fairfax, either upon the principle that an alien enemy could not take by devise, or the belief that the acts of 1782, ch. 8, and ch. 33, had already vested the property in the commonwealth. In either case it was a mistake which surely ought not to be pressed to the injury of third persons.

But if the construction, which we have suggested, be incorrect, we think that, at all events, the title of Hunter, under the grant of 1789, cannot be considered as more extensive than the title of the commonwealth, viz. a title inchoate and imperfect; to be consummated by an actual entry under an inquest of office, or its equivalent, a suit and judgment at law by the grantee.

This view of the acts of Virginia, renders it wholly unnecessary to consider a point, which has been very elaborately argued at the bar, whether the treaty of peace, which declares "that no future confiscations shall be made," protects from forfeiture, under the municipal laws respecting alienage, estates held by British subjects at the time of the ratification of that treaty.—For we are well satisfied that the treaty of 1794 completely protects and confirms the title of Denny Fairfax, even admitting that the treaty of peace left him wholly unprovided for.

The 9th article is in these words: "It is agreed that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominions of his majesty, shall continue to hold them according to the nature and tenure of their respective estates and titles therein; and may grant, sell or devise the same to whom they please in like manner as if they were natives, and that neither they nor their heirs or assigns shall, so far as respects the said lands and the legal remedies incident thereto, be considered as aliens."

Now, we cannot yield to the argument that Denny Fairfax had no title, but a mere naked possession or trust estate. In our judgment, by virtue of the devise to him, he held a fee simple in his own right. At the time of the commencement of this suit (in 1791) he was in complete possession and seizin of the land. That possession and seizin continued up to and after the treaty of 1794, which being the supreme law of the land, confirmed the title to him, his heirs and assigns, and protected him from any forfeiture by reason of alienage.

It was once in the power of the commonwealth of Virginia, by an inquest of office or its equivalent, to have vested the estate completely in itself or its grantee. But it has not so done, and its own inchoate title (and of course the derivative title, if any, of its grantee) has by the operation of the treaty become ineffectual and void.

It becomes unnecessary to consider the argument as to the effect of the death of Denny Fairfax pending the

suit, because admitting it to be correctly applied in general, the treaty of 1794 completely avoids it. The heirs of Denny Fairfax were made capable in law to take from him by descent, and the freehold was not, therefore, on his death, cast upon the commonwealth.

On the whole, the Court are of opinion that the judgment of the Court of appeals of Virginia ought to be reversed, and that the judgment of the District Court of Winchester be affirmed with costs, &c.

JOHNSON, *J.*

After the maturest investigation of this case that circumstances would permit me to mak , I am obliged to dissent from the opinion of the majority of my brethren.

The material questions are,

1st. Whether an alien can take lands as a devisee, and if he can,

2d. Whether an inquest of office was indispensably necessary to divest him of his interest for the benefit of the state?

3d. Whether the disability of the devisee was not cured by the treaty of peace, or the treaty of 1794.

With regard to the treaty of peace it is very clear to me that, that does not affect the case. The words of the 4th article are, "There shall be no future confiscations "made, nor any prosecution commenced against any "person or persons for or by reason of the part which "he or they may have taken in the present war."

Now should we admit, as has been strongly insisted, that to escheat is to confiscate, it would still remain to show that this was "a confiscation on account of the "part taken by the devisee in the war of the revolu-"tion." But the disability of an alien to hold real estate is the result of a general principle of the common law, and was in no wise attached to the individual on account of his conduct in the revolutionary struggle. The alien who had taken part with this country and

fought the battles of the states, may have been affected by it no less than he who fought against us, and the member of any other community in the world may as well have been the object of its application as the subject of Great Britain. The object evidently was to secure the individual from legal punishment—not to cure a legal disability existing in him.

With regard to the bearing of the treaty of 1794 on the interests of the parties, the only difficulty arises from the vague signification of the words "now holding," made use of in the article which relates to this subject. But in conformity with the liberal spirit in which national contracts ought to be construed, I am satisfied to consider that treaty as extending to all cases "of a rightful possession or legal title defeasible only "on the ground of alien disability and existing at the "date of that treaty."

What then were the rights of the devisee in this case? and were they in existence at the date of this treaty?

Whoever looks into the learning on the capacity of an alien to take lands as devisee, will find it involved in some difficulties. There is no decided case, that I know of, upon the subject. And the opinions of learned men upon it, when compared, will be found to have been expressed with doubt, or scarcely reconcileable to each other. The general rule is, that an alien may take by purchase, but cannot hold. Yet so fragile or flimsy is the right he acquires, that, if tortiously dispossessed, no one contends that he can maintain an action against the evictor. To assert that he has a right, and yet admit that he has no remedy, appears to me rather paradoxical. Yet all admit that the bailiff of the king cannot enter on an alien purchaser until office found. But where a freehold is cast upon the alien by act of law, as by descent, dower, custody, &c. it is admitted that no inquest of office is necessary to vest the estate in the king, and he may enter immediately. Whether an alien devisee is to be considered as a purchaser according to the meaning of that term as applied to an alien, or whether his estate is to be considered as one of those which are cast on him by operation of law, is an alternative, either branch of which may be laid hold

of with some confidence. *Chief baron Gilbert* asserts, without reservation, that a devise to an alien is void. (*Gilbert on devises, p.* 15.) But *Mr. Powell* maintains that he takes under it as a purchaser. (*Powell on Dev.* 317.) In support of *Gilbert's* opinion it might be urged that a devise takes effect under statute, and in that view the interest may be said to be cast on the alien by operation of law. Yet I have no hesitation in deciding in favor of the doctrine as laid down by Powell. Not on the words of *lord Hardwick*, as quoted from *Knight and du Plessis*; for the judge there expressly declines giving an opinion; but from a reference to the principle upon which the doctrine is certainly founded.

The only unexceptionable reason that can be assigned why an alien can take by deed, though he cannot hold, is, that otherwise the proprietor would be restricted in his choice of an alienee; or in other words, in his right of alienation. And to declare such a conveyance null and void would be attended with this absurdity, that the estate would still remain in the alienor in opposition to his own will and contract. It would therefore seem that the law on this subject would be more satisfactorily expressed by asserting that an alien is a competent party to a contract, so that a conveyance, executed to him, shall divest the feoffer or donor, in order that it may escheat. The tendency of this doctrine to favor the royal prerogative of escheat, would no doubt secure to it a welcome reception, yet it is not too much to pronounce it reasonable in the abstract. This reason is as applicable to the case of a devise as of a contract, and in the technical application of the term *purchaser* a devisee is included. But it is contended that the grant to lord Fairfax was a grant or cession of sovereign power, and as such was assumed by the state when it declared itself independent. Upon considering, as well the acts of the state, with regard to this property, as the acts of lord Fairfax himself, there is reason to think that both acted under this impression. But to decide on this question, we must look into the deed of cession, and upon its construction the decision of this Court must depend. And here, in every part of it, we find it divested of the chief attributes of sovereignty—not a power legislative, judicial or executive given, and the words such as are adapted to convey an interest,

but no jurisdiction. Some few royal prerogatives, it is true, are expressly conveyed, and these unquestionably must have accrued to the state upon the assertion of independence. But the interest in the soil remained to the grantee. So far, therefore, I feel no difficulty about sustaining the claim of the devisee. But did this interest remain in him at the time of the treaty of 1794?

I am of opinion it did not. The interest acquired under the devise was a mere *scintilla juris*, and that *scintilla* was extinguished by the grant of the state vesting this tract in the Plaintiff in error. I will not say what would have been the effect of a more general grant. But this grant emanated under a law expressly relating to the lands of lord Fairfax authorizing them to be entered, surveyed and granted.

The only objection that can be set up to the validity of this grant is, that it was not preceded by an inquest of office. And the question then will be, whether it was not competent for the state to assert its rights over the alien's property, by any other means than an inquest of office. I am of opinion that it was. That the mere executive of the state could not have done it, I will readily admit; but what was there to restrict the supreme legislative power, from dispensing with the inquest of office? In the case of *Smith and the state of Maryland*, this Court sustained a specific confiscation of lands under a law of the state, where there was neither conviction nor inquest of office. And in Great Britain, in the case of treason, an inquest of office is expressly dispensed with by the statute 33, H. VIII, c. 30. So that there is nothing mystical, nor any thing of indispensable obligation, in this inquest of office. It is, in Great Britain, a salutary restraint upon the exercise of arbitrary power by the crown, and affords the subject a simple and decent mode of contesting the claim of his sovereign; but the legislative power of that country certainly may assert, and has asserted, the right of dispensing with it, and I see no reason why it was not competent for the legislature of the state of Virginia to do the same.

Several collateral questions have arisen, in this case on which, as I do not differ materially from my bre-

FAIRFAX's
DEVISEE

v.

HUNTER's
LESSEE.
———————

threp, I will only express my opinion in the briefest manner.

I am of opinion that whenever the case, made out in the pleadings, does not, in law, sanction the judgment which has been given upon it, the error sufficiently appears upon the record to bring the case within the XXV section of the judiciary act.

I am also of opinion that whenever a case is brought up to this Court under that section, the title of the parties litigant must necessarily be enquired into, and that such an enquiry must, in the nature of things, precede the consideration how far the law, treaty, and soforth, is applicable to it; otherwise an appeal to this Court would be worse than nugatory.

And that in ejectment at least, if not in every possible case, the decision of this Court must conform to the state of rights of the parties at the time of its own judgment: so that a treaty, although ratified subsequent to the decision of the Court appealed from, becomes a part of the law of the case and must control our decision.