Catron, J.
delivered the opinion of the Court. The two town lots of one half of an acre each, were granted in a grant of 640 acres to Elisha Baker, in 1787, and conveyed by the grantee to White in 1791.
James White again caused the land to be granted to himself and William Blount in 1791 ; and again to himself in 1803. The three grants cover the lands in controversy, being lots No. 55 and 56, in the town of Knoxville.
On' the 2d day of May, 1794, the lot No. 56 was conveyed in fee by James White to Robert Johnston.
On the 13th June, 1795, the lot No. 55 was vested in Johnston in fee by the deed of John M’Dowell.
At the time these conveyances were made, Johnston was an alien, and continued so until his death, about the latter part of the year 1796.
These facts are set forth in the petition for the caveat; and furthermore, that the lots.were sold by the sheriff of [251] Knox County, and all the right, title, and interest of Margery Wilson, late Margery Johnston, Robert Johnston Grier, and Thomas Talbot, devisees of said Robert Johnston, vested in said Wilson by purchase and conveyance from the sheriff to Wilson.
On the 15th day of July, 1818, Thomas L. Williams, the caveatee, entered the two lots of land in the office of the fifth surveyor’s district, as vacant land, upon a North Carolina land warrant; and to prevent him from obtaining a grant, this caveat was filed by Wilson.
It was admitted upon the trial that the grants and mesne conveyances under which the caveator claims, and also the entry of the caveatee, cover the lands in dispute; and were executed and authenticated in due'form; and that the caveator had possession of the lands in controversy more than seven years before he filed his caveat.
The first question is, were the two lots subject to entry by virtue of a North Carolina land warrant, at the time the caveatee’s entry bears date.
North Carolina bound herself to give to her officers and soldiers of the continental line, who served‘in the war of the Revolution, certain quantities of land each, for his services and also contracted for the sale of lands, to enterers in John Armstrong’s office, for the purpose of raising money to > pay the arrears due the army. These lands were to be located in what is *574 now the State of Tennessee. In 1789, she ceded her western territory, now this State, to the United States, reserving the power to vest in fee, by grant, the lands she was indebted to her officers and soldiers, and the purchasers through John Armstrong’s office, where the grants had not issued; with some other description of claims. For this purpose, and this only, North Carolina retained power over the ceded territory. After we became a State, jealousies arose between this and that government, which rendered it almost impracticable for North Carolina to have her lands entered, surveyed, and granted, which she had promised to her soldiers and others ; in the end, a compromise was effected by the assent of the government of the United States; by which this State was made the agent [252] of North Carolina, and fully authorized to issue the grants that State had reserved the power of issuing by the Cession Act to the United States.
To ascertain the true claimants entitled to receive lands from North Carolina, by virtne of our delegated authority, the Legislature, by the Acts of 1806 and 1807, constituted a Court of Commissioners to examine the evidences of claim, and decide who was truly entitled to lands, and how much, and warrants were issued directing the surveyors today off the land to the claimant; by the 40th section of the Acts, the warrant holder was authorized to enter with the surveyor any lands which had not theretofore been appropriated by North Carolina. These statutes carefully pursue the authority by which they were passed (the Act of Cession from North Carolina to the United States), by which North Carolina reserves the power to satisfy the claims against her, “ out of vacant and unappropriated lands ”; this power, and this only, were we authorized to execute by virtue of our agency.
All lands which might escheat after the Cession Act would of course escheat to the sovereign power, the government of the United States, until the formation of our Constitution, and afterwards to this government.
In such escheated lands North Carolina reserved no interest in favor of those to whom she was indebted ; nor had she more power than any other State in the Union to claim the 'right of paying her debts therewith; she never professed to do so ; nor has this State, as her agent, ever manifested any such intention by any of her legislative acts; we therefore think that these lots were clearly not subject to entry by the caveatee.
But suppose the fact to be that the lots had been subject to entry; James White’s grant for 80 acres, dated 15th November, 1808, also made by virtue of a North Carolina warrant, would hold the same from the caveatee. It is therefore immaterial whether the land did or did not escheat on the death of the alien Johnston: the caveatee had no right vested in him by the North Carolina warrant to enter the same.
[253] The next question is, had the caveator any such claim to the. *575 ]ots in controversy as to authorize him to resist the"”caveatee’s entry by this mode of proceeding ?
This Court thinks he clearly had for more reasons than one.
1st. He had been in peaceable possession for more than seven years, claiming for himself; had a deedyirima facie good upon its face to vest in him a title in fee to the lots. The Court think this a sufficient claim, within the meaning of the 16th and 47th sections of the land laws of 1806 and 1807, to authorize the caveator to .resist the caveatee’s entry, and prevent him from obtaining a grant.
2d. Johnston could, and did, although an alien, acquire an estate in fee in the lots, by the conveyances of White and M’Dowell, subject only to be divested by the government upon office found. Fairfax’s Devisees v. Hunter’s Lessee, 7 Cranch’s Rep. 619; Page’s Case, 5 Rep. 52; Blount’s Lessee v. Hornbled, 2 Haywood’s Rep. 36.
By the above mode of proceeding in Johnston’s lifetime, or after his death and devise of the lands, the alienage could have been ascertained by regular adjudication, and the' possession seized upon if escheated; and when perhaps Johnston himself, or his devisees after his death, could have made it appear that the lots, perhaps, did not escheat by reason of alienage of the purchaser. The lot No. 56 was conveyed to Johnston the 2d day of May, 1794, by James White; in September, 1794, Jay’s treaty was made with Great Britain ; by the 9 th article of which, it is stipulated that British subjects, holding lands in the United States, shall have an indefeasible title therein.’ See Blight’s Lessee v. Rochester, 7 Wheaton’s Rep. 535, 544; Hughes v. Edwards, 9 Wheaton’s Rep. 496.
It does not appear from the record to what country Johnston owed allegiance ; if to Great Britain, the treaty of 1794 gave him an indefeasible title in fee to lot No. 56.
Possibly he, or 'those claiming under him by will, might show, upon a proceeding by government to ascertain the alienage, that he had purchased and paid for lot No. 55, before September, 1794, and was secured by the British treaty [254] to this also, although it was not conveyed to him by M’Dowell until 13th June, 1795,
Aliens, in by purchase, must be deemed citizens in any controversy with other citizens. It is the sovereign power only where the real estate is situated that has the right to disturb the alien in his title and possession; it is a mere matter of policy that the government may oust him, pertaining solely to the State, over which the citizen has not, nor ought he to have, any control.
Whatever title Johnston acquired to the lots by purchase, the better opinion seems to be he could convey by deed or will, and that his devisees took the same estate he had. Sheafe v. O’Neale, 1 Mass. Rep. 256; Fairfax’s Devisees v. Hunter’s Lessee, 7 Cranch’s Rep. 620; Blight’s *576 Lessee v. Rochester, 7 Wheaton’s Rep. 545, 1 Comyn’s Dig. Am. edition, 559.
It is admitted in the record that Wilson, the caveator, had vested in him, by virtue of the purchase at the sheriff’s sale, and the sheriff’s deed, all the right, title, and interest of the devisees of Johnston. And if an alien can convey, by deed or will, and we are inclined to think he can (yet deem it unnecessary to give any conclusive opinion upon this point in the present case), it follows that the caveator had the fee simple title to the lots, subject to the assertion of the right of the State; and, therefore, in relation to the caveatee, stood upon the same footing with the original grantee, and had an equal right to file and prosecute his caveat, because the title was regularly derived to him by mesne conveyances from the grantee.
That the grantee could have sustained the caveat, is settled by the cause of Williams’s Heirs v. Buchanon, 2 Tenn. Rep. 278.
This Court therefore apprehend there was no error in the judgment of the Circuit Court, and order it to be affirmed, and that the caveatee pay the costs of this cause.
Judgment affirmed. [1]

 Original Note.—The general principle that an absolute title to lands purchased by an alien does not vest in the government wherein the land is situated, until office found, has been settled in a variety of cases, in tljis country as well as in England. See 5 Coke Rep. 52 b. Page’s Case ; Powell on Devises, 317 ; Jackson v. Beach, 1 John. Cases, 401 ; Jackson v. Lunn, 3 John. Cases, 109, 1 Comyn’s Digest, Alien C. 4; Den v. Simpson, Cam. & Nor. Rep. 192; Marshall v. Lovelass, Cam. & Nor. Rep. 233 ; M’Creery v. Allender, 4 Harris & M’Henry, 409. He may hold it against all the world, hut the government, and is not accountable for rents and profit's previously received. Craig v. Lesle, 3 Wheaton, 563.
The same rule prevails not only in cases of a direct purchase by the alien himself, but also in cases of a devise of land to him. Powell on Devises, 316 ; Fairfax, devisee v. Hunter’s Lessee, 7 Crunch, 603, 619; Fox v. Southack, 12 Mass. Rep. 143 ; 1 Murphey’s Rep. 195.
But although lands purchased by, or devised to an alien, are vested him by the government during his life, subject only to be divested, yet immediately upon the decease of the alien the law casts the freehold and inheritance upon the government, otherwise the freehold would be in abeyance. Coke Litt. 2 b. But if he conveyed the estate in his lifetime, the purchaser takes a defeasible estate, which an office found will divest 7 Cranch, 603, 619; 8 Mass. Rep. 445.
As to the power in general of aliens to take and hold lands, vide, in addition to the above authorities, Craig v. Radford, 3 Wheaton’s Rep. 594; Orr v. Hodgson, 4 Wheaton’s Rep. 453 ; Seawel v. Lee, 9 Mass. Rep. 363 ; Doe v. Hornblen, 2 Haywood’s Rep. 37. — Reporters.