Parker, J.
This case was very ably and elaborately argued by counsel, and has stood over since November last, for the consideration and judgment of the court. I have bestowed upon it the attention due to the importance of the principles discussed at the bar, and have attentively examined the various authorities and acts of assembly referred to in the argument; but I do not think it necessary to encumber this opinion by reviewing them in detail, and shall content myself with a brief statement of the conclusions to which my mind has been brought.
The action is ejectment, brought in the year 1813 by Thomas Swann, who claims to derive his title under Thomas lord Fairfax (through James Marshall and Denny Martin Fairfax) against Adam, Stephen, the son of Robert Stephen, who was a lessee of the land in controversy under lord Fairfax. The appellants are the heirs of Adam Stephen, who died pending the suit; and at the trial they demurred to the plaintiff’s evidence. The *412 jury found a verdiqt for the plaintiff (subject to thatdetnurrer) for the lands in the declaration mentioned, containing 674 acres and three quarters of an acre, designated by metes and bounds; it being the same tract iease¿ in the year 1781 by lord Fairfax to Robert Stephen: and the court gave the judgment which is now sought to be reversed. To sustain the judgment, the plaintiff must shew a possessory right, or a strict legal title properly deduced; but in doing so, he has the benefit of every inference of fact which the jury might .fairly and reasonably have drawn from his evidence, disregarding that offered on the other side, so far as it conflicts with his own.
As twenty years peaceable and uninterrupted possession not only bars, but gives, a right of entry, and is a good title in ejectment, if lord Fairfax were the plaintiff here, l am inclined to think he would not be required to shew any oiher title. The deed of lease to Robert Stephen in May 1781, Stephen's signature to that lease, his recognition of the Fairfax title (at least by a strong implication) in his answer to Bedinger's bill as late as the year 1797, his continuing in possession of the land until his death, and his never setting up any claim to it for himself, so far as we know, unless his procuring a patent for it in the year 1810, by virtue of entries and surveys which in the year 1787 he had agreed with Hunter and Pendleton to take an assignment of, for the benefit of the Fairfax claimants, be considered an adverse claim; all these, I say, are circumstances from which the jury might fairly have inferred a holding under lord Fairfax, and for him, of near 30 years; so as to dispense with any further proof of his title. Indeed, taking Robert Stephen's answer to that bill tobe a recognition of Benny Martin Fairfax's title (as his communications with his accredited agent in 1787, his endeavour to secure the land to such agent from the attempts of Hunter and Pendleton to acquire title under *413 the commonwealth, and his subsequently actually agreeing with them to assign their rights to him for such ¿gent, would seem to indicate) a jury might have been justified in considering the possession of Robert Stephen from the death of lord Fairfax in 1781 until he obtained a patent to himself in 1810, as the possession of Denny Martin Fairfax and those claiming under him. He was acting in the year 1787 as a collector of the rents and quit rents due the estate of lord Fairfax, and no doubt accounted for his own rent with Thomas Bryan Martin and Gabriel Jones, the agents of Denny Martin Fairfax, with whom he seems to have been in communication; and he was perfectly cognizant of the claim of Demy Marlin Fairfax to the leased lands, which some persons were then endeavouring to enter and survey, under land office treasury warrants. It would, under these circumstances, be scarcely considered a violent presumption, to hold that Robert Stephen's possession was the possession of Denny Martin Fairfax and of those claiming title under him, which, having continued without interruption for more than 20 years, would enable Swann to recover in this action, without enquiring into the title of Denny Martin Fairfax.
But waiving these views of the subject, I shall consider the title of the lessor of the plaintiff as one deriving no strength from the possession of Robert Stephen, but depending on its own intrinsic validity. He is then to shew, first, that lord Fairfax's title is a good one. This is, I think, fully made out by the proofs in the cause. The act of 1736, given in evidence by the plaintiff (1 Rev. Code, cb. 89. p. 343.) expressly recognizes lord Fairfax as the rightful proprietor of the Northern Neck, in which these lands lie, and recites the several charters and intermediate grants which establish his title. By virtue of that legislative recognition, equivalent, I think, to an express patent or grant, he has ever since been considered in our courts as tenant in fee of *414 the lands within the Northern Neck, having a property in the soil, and a complete seisin and possession thereof, independent of his seignioral rights; and it is now too late to question that title. The cases of Hite v. Fairfax, 4 Call Picket v. Dowdall, 2 Wash. 106. Johnson v. Buffington, Id. 116. Curry v. Burns, Id. 121. Marshall v. Conrad, 5 Call 364. and Fairfax’s devisee v. Hunter’s lessee, 7 Cranch 603. fully sustain these positions; nor are they at all controverted by judge Roane in his opinions in the cases of Marshall v. Conrad, and Hunter v. Fairfax’s devisee, 1 Munf. 218. but on the contrary, his arguments proceed upon the validity of that title as a concessum, and would otherwise have been wholly supererogatory.
Taking, then, lord Fairfax’s title to be unquestionable, the next enquiry is, whether it passed to his devisee Denny Martin Fairfax ; and here, two objections are raised to that conclusion. First, it is said, that Denny Martin Fairfax being an alien enemy at the time of lord Fairfax’s death, he was incapable of taking, even for the benefit of the commonwealth, and subject to escheat. It is scarcely denied that an alien friend could take by devise; but it is urged that an alien enemy cannot take. No authority has been cited in support of that distinction, unless it be a dictum of Swinburne, wholly unsupported by the case he refers to, of Collingwood v. Pace, 1 Vent. 413. That case simply decides that a devise to the heir of an alien, living the ancestor, was void, for nemo est hares viventis, and that an alien could not by the law of England have an heir. On the contrary, the two cases of The Attorney General v. Duplessis, Parker’s Rep. 144. and The Attorney General v. Weedon, Id. 267. are strong to shew, that an alien may, flagrante hello, acquire rights under a will, escheatable to the crown by an inquisition of forfeiture. The very question, however, arising on this will, came before the court of appeals in Marshall v. Conrad, and before the federal court in Fairfax’s devisee v. Hunter’s lessee, and was in each *415 case fully considered, and deliberately decided in favour of Denny Martin Fairfax’s right. In the last case, judge Johnson, who dissented from the majority of the court on one of the points involved, agreed with them in this. I think both courts were fully sustained by the authorities they relied on, and by the principles upon which .rests the doctrine of the Incapacity of an alien to hold lands without the assent of the state. There can, indeed, be no sound distinction between a devise to an alien friend, and a devise to an alien enemy. The right of the commonwealth to the land devised does notarise out of a state of war, but results from mere municipal legislation. It accrues, as judge Roane has well expressed it (in Read v. Read, 5 Call 207.) “ not because’ the person purchasing is an enemy, but because he is an alien. It is not a right pointed against the subjects of a particular power with whom we may chance to be at war, but against the subjects of all foreign nations whatsoever.” It involves no improper intercourse with the enemy, and gives no aid or strength, but simply divests the heirs of the grantor or devisor of the land, and enables the grantee or devisee to take for the benefit of the state, whenever she chooses to assert her right; and if she does not assert it, but at the return of peace confirms the inchoate title of the devisee by treaty, such as that of 1794, it is only a reasonable mitigation of the evils of war, which humanity and civilization sanction and approve; and the more emphatically where the contest is a civil one, between subjects of the same empire.
It is next objected, that only one sixth of the land in question passed to Denny Martin Fairfax under the will of lord Fairfax, and that the judgment on the demurrer to evidence, ibr the whole tract, cannot be sustained. The language of the will gives countenance to this objection, and I have always thought it the most doubtful, if not the only doubtful part of the case. It gives “ all that undivided sixth part or share of my lands or plan *416 tatiotls in the colony of Virginia, commonly called or known by the name of The Northern Neck of Virginia, with the several advowsons and rights of presentation thereunto belonging or appertaining, I have therein, with messuageg anc[ tenements, buildings, hereditaments and all other the appurtenances thereunto belonging, all or any part thereof, being formerly the estate of the late Alexander Culpeper esquire deceased ; together with all my other lands and tenements I háve, or am possessed of, or have a right to, in the said colony of Virginia.” In a subsequent part of the will, after various devises, the testator gives all the rest and residue of his estate, both real and personal, not therein before disposed of, to the same Denny Martin, his heirs and assigns forever.
It is certainly very difficult, at this distance of time, and without a precise knowledge of the family of lord Fairfax, and how he succeeded to the rights of Thomas lord Culpeper as his heir at law (as recited in the act of 1736) or what estate Alexander Culpeper held in the Northern Neele, to understand the meaning and .bearing' of this clause. It is shewn by historical documents, that lord Fairfax claimed the proprietorship of the Northern Neele, at least as early as the year 1733, and came to Virginia in 1736. Sometime after, he established a land office, and was in the habit of granting lands to others, reserving a quit rent, and of appropriating tracts of land to himself by deed of conveyance and reconveyance, or by demise to tenants for life or years, reserving an actual substantial rent. These deeds and leases were entered in his office, and were made, not for the purpose of perfecting his title (for, according to the opinion of the judges in Marshall v. Conrad, the fee simple of all the lands ungranted remained in him) but to shew to others what he had appropriated to his individual use, and what, therefore, he no longer considered vacant lands, subject to the warrants of others. In this mode he must have acquired *417 much land, which he never could have considered as a part of the estate of Alexander Culpeper; and keeping this distinction in his mind, he may have referred in the first part of the above recited clause in his will, to his proprietary and seignioral rights, one sixth of which he may have inherited from Alexander Culpeper, whilst five sixths belonged in equity to other persons, under some settlement or arrangement of which we are now ignorant. The one undivided sixth part of which he speaks, formerly belonged, he tells us, to Alexander Culpeper, and there were advowsons and rights of presentation belonging thereto; which could not have been predicable of the lands acquired after he came into the country, and appropriated to his own use by conveyance and reconveyance, or by leases reserving more than nominal rents to himself. These latter he intended to pass by the other words of the clause, or by the residuary clause before recited ; and if he was entitled to the whole, but intended to pass but one sixth, yet this residuary clause passed all his interest, and vested it in his devisee, according to the cases I had occasion to cite in the late case of Miars v. Bedgood ex'or.*
This conjecture (for it is little more) about the meaning of lord Fairfax in relation to the undivided sixth part, is somewhat confirmed by the terms of the power of attorney given by Denny Martin Fairfax on the 7th of November 1783, to Thomas B. Martin and Gabriel Jones; for that power authorizes them to demand and receive from Robert then lord Fairfax, or his agents, all money rents or revenues due or to become due to him in respect of the one sixth part or share of the Northern Neck; and to grant, or unite with the agents of the said Robert lord Fairfax in granting, the ungranted lands of the Northern Neck, with the usual reservations. These money rents or revenues were doubtless the quit rents due to the lord proprietor as such, which Robert lord *418 Fairfax, as then lord proprietor, might demand; and the lands were the ungranted, not the appropriated lands. And as to the rents, it is observable that they were expressly reserved by Denny Martin Fairfax, when he conveyecf j-,¡s other interests to James Marshall; possibly because he knew .that he had but an equitable right to one sixth. I say an equitable right, because I am satisfied that lord Fairfax had the legal right, as lord proprietor, to the whole Northern Neck; for it is impossible otherwise to account for the long acquiescence in such right, and for the silence of those who must have known the true state of the title, and whose interest it was, in many instances, to assail it. I should conclude, that whilst lord Fairfax, as heir at law to lord Culpeper, was the proprietor and owner of the legal fee tail, there were family settlements which gave equitable rights to others, one of whom was Alexander Culpeper, and that his right passed to lord Fairfax, and was intended to be embraced by him in the first part of the clause aforesaid. In any event, I should say that there is no legal title to five sixths of the tract of land in question, shewn to be outstanding in any other person or persons, of which, on this demurrer to evidence, the defendants can avail themselves to avoid a recovery. The land being held for so long a period by the tenant of lord Fairfax, and no claim having ever been set up by others, the jury would have presumed, if necessary, a surrender of such rights, if they ever existed; and if lord Fairfax held the legal title to the whole in 1736, in tail or in fee, it passed in 1781, by his will, to Denny Martin Fairfax: all estates tail being at that date converted into fees.
In this point of view it is unnecessary to decide what influence the case of Humphreys's adm'r v. West's adm'rs, 3 Rand. 516. should have upon this cause. If it be true, that, on a demurrer to evidence, the only question the court can consider is whether the evidence supports the issue or not, and that the amount of the dama *419 ges, or extent of the finding, is not a question for the court, but for the jury, to be controuled only by granting a new trial, it would seem to have a very powerful in- ~ 1 # fluence; for here the whole tract is found for the plaintiff, subject to the question whether the law be for the one party or the other; and if it be for the plaintiff, I doubt whether the court could, on this verdict, give one sixth, and whether it must not enter an absolute judgment for him, or a judgment for the defendants.
The next objection to the plaintiff’s recovery is, that if Denny Martin Fairfax had title at all, it was a defeasible one, a mere scintilla juris, of which he was divested before 1794, by certain acts of assembly, operating in the nature of inquisitions of office. I cannot subscribe to this opinion. No acts of assembly have any bearing upon this question, which were passed before the death of lord Fairfax ; for he was a citizen, and his title was uniformly recognized. His seignioral rights were no doubt suspended, and ultimately destroyed, by the revolution ; but bis interest in the soil remained unimpaired. The act of 1781 applied to quit rents only, and could not be extended farther than to sequester or to escheat lands subject to quit rents. The acts of 1782 and 1785 refer, in terms, to waste and unappropriated lands; and it was under the 5th section of the latter act that judge Johnson, in the case of Fairfax’s devisee v. Hunter’s lessee, decided, in opposition to the rest of the court, that the grant of the commonwealth in 1788, for a tract of vacant land, divested the interest of Denny Martin Fairfax. Nor did judge Ilaane ever go farther than to contend, that these several acts of assembly sequestered and took possession of quit rents, of lands granted subject to quit rents, and of waste and unappropriated lands. But the land leased by lord Fairfax was in no one of these predicaments. It was not vacant land, nor was the rent reserved a quit rent. It had less of that character than the rent reserved in *420 the case of Marshall v. Conrad; for it was a rent of £12. 10. sterling per annum, on a tract of 671 acres, which at the time was probably a fair and full one. It is, however, unnecessary to insist on these distinctions; fQr j am weq satisfied that none of the acts referred to, subsequent to the death of lord Fairfax, were intended by the legislature to have the effect of inquisitions of office. For the reasons of this opinion, it is only necessary to refer to judge Fleming's opinion in the case of Hunter v. Fairfax's devisee, 1 Munf. 218. and to that of the supreme court in the same case, reported in 7th Cranch 603.
If the title remained in Denny Martin Fairfax at the date of his conveyance to James Marshall, it passed to him by the deed of the 30th August 1797, and to the lessor of the plaintiff by Marshall's deed to Swann of the 19th of April 1806; and it is entirely unaffected by the patent obtained by Robert Stephen in 1810, which the commonwealth had then no authority to grant, or by the possession of Adam Stephen from the death of his father in 1811 to the time of bringing this action in 1813.
But some reliance has been placed upon supposed interfering grants to Strode and Mitchell. As to Strode's claim, it was decided (as I think, on the merits) against his assignee Bedinger, many years before the institution of this suit, and in the lifetime of Robert Stephen. The warrant under which he claimed was dated in 1763; he failed to comply with the rules of the office, which required him, within six months, to return his survey and perfect his grant (see Picket v. Dowdall, 2 Wash. 106.); and he never asserted his claim before any legal forum until 1795, nor made his survey until 1791. Bedinger's bill was dismissed in 1805, and his claim cannot be permitted now to interfere with the rights of the plaintiff.
*421 As to Mitchell's 116 acres—there is no evidence in this record that it was a good claim, unless we rely on the answer of Pendleton alone, which I apprehend we ought not to do. Nor is it any where shewn (except by the deposition of Bedinger, which is no part of the demurrer to evidence) that it is included in the tract of land which is the subject of this suit. Bedinger asserts in his bill, that Robert Stephen had leased from lord Fair-fax a tract of land, about three hundred acres of which was a part of the 400 acres he claimed as assignee of Strode; and Pendleton, in his answer to that bill, says that Strode's 400 acres included about 116 acres belonging to Mitchell. This may be true, and yet it may be no part of the 800 acres leased by Robert Stephen; for it might be included in the balance claimed by Strode, without the boundaries of lord Fairfax's lease.
For those reasons, I am for affirming the judgment.
Brooke and Cabell, J. concurred.
Judgment affirmed.

 Reported ante, p. 361.