Ilonisblower, C. J.
The demandant who was.a native of this country, was married here, to James Yeo, a British subject, in the year 1808. On the 14th May, 1813, when Great Britain and this country were at war, Tunis Covert, in consideration of eight hundred and six dollars, conveyed the premises of which dower is demanded in this action, to Joseph T. Baldwin, in fee, “ in trust to and for the use, proper benefit and be-hoof of James Yeo, his heirs, executors, administrators and assigns;” in which deed the premises are described, as then in the actual possession of the said James Yeo. On the 24th May, 1814, Baldwin, for the same consideration, conveyed the premises to Thomas Parcell, in fee; upon precisely the same trust, and expressed in the same words, as in the deed from Covert to Baldwin. On the 26th November, 1814, Parcell executed a writing under his hand and seal, in which, after reciting the conveyance to him in trust, as aforesaid, he covenanted with Yeo, to convey the premises, at any time thereafter, at the request and costs of Yeo, his heirs and assigns, to him or them free and clear of all incumbrances &c. On the 6th June, 1815, Parcell by deed, in consideration of one thousand dollars, and after reciting the conveyance to him in trust, and the aforesaid covenant made by him to Yeo, and after stating, that it was done at the request of Yeo, and that the said consideration money had been paid to him by Ephraim Leonard, “for and on account of” said Yeo, conveyed *388 the premises to said Leonard, in fee. Under this deed Leonard took possession; Yeo having continued in possession up to that time, which was several months after peace had been declared between this country and Great Britain. On the 28th January, 1823, Leonard, in consideration of two thousand and eighty dollars, conveyed the premises, in fee to Mercereau, the defendant. Yeo, died in the year 1829, without ever having been naturalized, and left surviving him, two children by his wife, the demandant in this cause, who were born in this country. Upon these facts, so far as her right to recover dower in the premises, depended, the demandant rested. It may be added however, that the demandant proved, that the defendant, at the time he purchased of Leonard, had notice of her claim of dower, and retained in his hands six hundred dollars of the purchase money, as an indemnity against her claim. She also gave evidence of the annual value of the premises ; and a demand of dower in writing on the 30th of July, 1831.
The defendant gave in evidence a deed, dated 29th May, 1815, acknowledged the 3d of June, 1815, and recorded the 12th of the same month, from Parcell, for the premises in question, to Leonard, in fee, with full covenants of warranty, and without any recital of, or reference to any trust whatever. Also, a mortgage, dated 13th August, 1814, acknowledged the 10th September, 1814, and recorded the 30th May, 1815, from Par-cell and wife .to Covert, to secure the sum of three hundred and eighty two dollars and fourteen cents, with interest on a certain day, according to the condition of a bond given by Parcell and Yeo, to Covert, which mortgage makes no mention of any trust, and has since the day of payment, been cancelled of record.
Why two deeds were given by Parcell to Leonard ; one reciting the trust &c. and the other not, I do not know; but I do not perceive that that circumstance, can have any influence on the real questions in this cause.
Two leading questions were made by counsel on the argument, viz:
I. Whether under our statute relative to dower, a widow is entitled to and can recover dower, at law,- of lands held by another, in trust, for her husband and his heirs ?
II. Whether the widow of an alien, who purchased, while an *389 alien enemy ; but continued to possess and enjoy the estate, after he became an alien friend, can have dower ?
Our statute, Rev. Laws 397 ; Eira. Dig. 143, seo. 1, is as follows : “ the widow, whether alien or not, of any person dying intestate, or otherwise, shall be endowed &o. of all the lands, tenements and other real estate, whereof her husband, or any other to his use, was seized of an estate of inheritance, at any time during coverture, to which she shall not have relinquished or released her right of dower, by deed &c.”
The question arises, on the words, “ or any other to his use : ” and the only case, in which the meaning of those words, has been drawn into discussion, is that of Montgomery v. Brucre, 1 South. R. 260.
In that ease, two principal questions arose: First, a question of fact; whether the defendant held under and stood in the place of the mortgagee ? And secondly, a question of law; whether the legal seizin of mortgaged premises, is in the mortgagee, or mortgagor, while the mortgage is outstanding and unsatisfied ? In other words, whether the husband of the demandant, who had mortgaged the premises, before his intermarriage with her, was ever so seized at any time during coverture, as to entitle her to dower of the mortgaged premises ?
Upon the facts of the case, the Chief Justice and Mr. Justice Russell, were of opinion, that the defendant held under the mortgage, and that consequently, the widow under any circumstances, could not have dower, without offering to redeem pro tanto. And as to the question of law, upon the supposition, that the defendant was not clothed with the rights of the mortgagee, they were of opinion, that the husband had never been so seized after the coverture, as to entitle her to dower. On the other hand Mr. Justice Southard was of opinion, that the defendant did not hold under the mortgage; and that therefore the widow was entitled to dower, notwithstanding the mortgage had been given prior to her marriage : upon the ground, that the legal seizin remained in the mortgagor.
This opinion of Mr. Justice Southard, was afterwards sustained by the court of Appeals, 2 South. R. 865, a result, with whien this court expressed its satisfaction in Woodhull v. Reid, 1 Harr. R. 128. But I do not consider that that decision, ne *390 cessarily involved the discussion, or at all depended upon the construction of our statute relative to dower. If Justice Southard was right, as I. have no doubt he was, in stating that the interest of the mortgagee is a mere incumbrance, or security ; and that the legal estate remains in the mortgagor, then the widow, is entitled to dower, not under the words of our statute, nor by reason of any equitable rights of the husband ; nor because the mortgagee is seized to his use: but upon the broad, legal ground, that the husband continues at law, to be the real owner and remains seized of the mortgaged premises, as against all the world, except the mortgagee, and those claiming under him.
There is no similarity between an equity of redemption, and a trust estate. An equity of redemption, it is true, is an equitable right or estate; but it is a right, in equity to relieve the land from the incumbrance, and to be restored to the possession and enjoyment of it, in fee. But a irusl, .is not an estate in land. It is no matter where the legal title is, or who is seized of the land: it is an estate, out of laud : existing only, in foro conseientice, and which can be reached, recovered, protected and dealt with, only in a court of equity. And yet, it is real estate; an estate of inheritance, of which the owner may be seized, in law or fact; and therefore, if within the reach of our process, as much, upon principle, the subject of dower, as any other real estate. But our process will not touch it: we cannot admeasure it, and set it off by metes and bounds. We cannot put the widow in possession, by any writ known to our court.
Whether the creation of trusts, as distinguished from uses, was wise or unwise : whether it has had, or has now, under our institutions a baneful or salutary influence, it is not for us to decide. We cannot by judicial decisions, legislate the distinction out of existence, and reduce all trusts to mere legal estates in possession.
But the question recurs: what did the legislature mean by the words, “ or any other to his use ? ” After the most serious reflection, I cannot adopt the suggestion of Chief Justice Kirkpatrick, in Montgomery v. Bruere. I cannot believe that those words refer to the bargainer, as the person seized. It is true, there is a difference between the language of our statute of uses, Elm. Dig. 80, pl. 3, and the statute of 27 Hen. 8. But they are so *391 substantially the same, and their design so identical, that we are not called upon to give them different constructions. And when we reflect, that our judicial records, furnish us with no case, in which the widow’s right of dower, was ever questioned, under our statute for transferring uses into possession, I cannot suppose those words were inserted to remove any doubt or difficulty on that point. Yeither can I presuade myself, that the words, “ or any other to his use ” were inserted merely for the purpose of giving a widow dower of a pure technical trust estate. The dower given by the statute, is dower of the land/ not of the trust or use. It is dower of a legal, not of an equitable estate ; and it is to be recovered in a court of law, and by legal process ; for, the second section says, “ until such dower, be assigned to her, she may remain in and hold and enjoy the mansion house &c.” This, as well as other provisions of the statute, shows most clearly, that the legislature had in contemplation only such dower, as might be assigned to her by the heir or devisee. The cestui que trust cannot enter upon the land, turn the trustee out of possession and set off to the widow, one-third of the land.
Again, if she is to recover the actual possession of the lands which were held in trust for her husband and his heirs, who is to be the tenant to the precipe ? The trustee, or the cestiá que trust f And what is to be the form of the writ, in sueh ease ? These are questions that must be answered; if we decide, that a widow is to be endowed of the lands. And more than this; the death of the husband, must defeat and put an end to the object of the trust. It must throw it into confusion, and be destructive of the rights and interests of all the cestuis que trust. The premises may be of such a nature, that giving the widow the actual possession of one-third part of it, may render the residue entirely valueless and unproductive to the cestui que trust. In short, such a construction of the statute, amounts to an abolition of all trusts, and turns them into legal estates in possession. If it had been the intention of the penman of the statute to place dower on the same footing as curtesy, in relation to trusts, would he not have used more appropriate language, by saying that a widow should be endowed of a trust, in all eases, where the husband had such an estate in the trust, as would have entitled her to dower in the land, if the estate of her husband had been a legal *392 instead of an equitable one. A provision to that effect would have placed curtesy and dower upon the same footing, and the widow entitled to dower of a trust, would have had her appropriate remedy, as the husband has for his curtesy, in the court of Chancery.
Nevertheless, the words “or any other to his use,” must have been inserted for some purpose. At any rate, we are not allowed to reject them as surplusage or unmeaning, so long as they are susceptible of any intelligent construction. If we were at liberty to suppose that this section of the act, was the work of an unprofessional pen, we might easily account for the insertion of the words, by imagining the author ignorant of the existence and influence of the statute for transferring uses into possession. But such a speculation is neither proper nor necessary in this instance. In my opinion, those words were introduced with great propriety and are useful and operative words in the connection in which they stand.
In the first place, if at the time of passing the statute, there was, or is now, any doubt who is seized of the legal estate, the mortgagor or mortgagee, so as to render the widow’s right to dower in mortgaged premises, at all questionable, this statute settles and puts an end to that question. For if the seizin is in the mortgagee, he is clearly seized to the use of the mortgagor ; for the rents and profits go to his benefit, by extinguishing the debt; and when that is satisfied, the seizin and possession reverts to him. These words, in the statute would therefore, settle the widow’s right to dower in such a case, if any doubt on that point remained.
Again, in general terms, why may not those words have been inserted for the express purpose of giving the widow dower of the lands, in all cases where any person is so seized to the use of the husband, as in equity, would entitle him to the legal estate and the actual possession and seizin of the land itself: in other words, wherever the husband is the true and real owner in equity of the land itself. Such cases may exist. For instance, upon a covenant to stand seized to the use of the husband and to convey &c. upon request. Or again, suppose the husband makes a purchase and pays the money, but dies before he gets a conveyance: or suppose another person buys land with the husband’s money *393 and for him, but takes a deed to himself in fee: in either case the husband is the true owner of the land. The vendor in the first case, and the agent or purchaser, in the other, stands seized to the use of the husband; and in equity he is entitled to a conveyance in fee. If before such conveyance made, or pending a bill to obtain one, the husband should die; why should not his widow have dower of such lands ? I see no reason why she should not; and in my opinion, the words, “ or any other to his use,” were inserted to reach just such cases; and all others, if any exist, in which another is seized of lands during coverture, to the use of the husband, under such circumstances, as in equity entitles the husband, or his heirs, to a conveyance of a legal estate and the actual seizin and possession of the land.
This satisfies the words of the statute, and I cannot carry them so far as to give the widow dower at law, of a purely equitable estate out of lands, of which lands, her husband never had, and never could have, seizin in law or in deed. If such had been the design of the legislature, I think they would have used more appropriate words; and would at leasPhave placed the husband’s curtesy on the same footing; and given him the possession of the land itself, instead of leaving him to the mere equitable remedy and estate.
Who then was the real owner of the land in question ? We cannot doubt upon the facts stated, that really and in truth it always belonged to the husband : that he bought and paid for it with his own money; and, as a matter of caution, he being at that time an alien enemy, had it conveyed to Mr. Baldwin for his use. In 1814, Parcell executed a covenant with Yeo, to convey to him, his heirs and assigns, upon request. This was equal to a covenant to stand seized, &c. In June, 1815, after the peace, Parcell conveyed the premises in fee, discharged of the trust, to Leonard, under whom the defendant holds : and in that deed Parcell recites the trust under which he held the property: that he had covenanted to convey it to Yeo, his heirs or assigns, upon his or their request: and that it was at Yeo’s request, and upon receipt of the consideration money “ for the use and on account of Yeo,” that he conveyed the premises in fee to Leonard. Leonard was then, in truth and in fact, the assignee of Yeo, and held under him; and of this deed and its contents, which was on *394 record, the defendant must be considered as having notice. He purchased, then, of Leonard, with notice that Leonard was, in reality, and according to the substance of the transaction, though not in form, the grantee in fee of Yeo.
In Bernard v. Warren, 3 Green’s R. 447, in this court, it was held, that a man who had purchased the land, paid for it, ta'ken possession and used, it, was the real owner, and so seized of a freehold in .it as to giye him a settlement, although at the time of the purchase, he had caused the legal title to be conveyed to a friend, in trust for himself and his wife, during their joint lives, and after the death of the survivor of them, to their children in fee. So in this case, Parcell was the-naked depository of the title for Yeo, and bound by his covenant to convey it to him upon request. He was.seized during the coverture, to the use of Yeo, of land, which Yeo had a right to the title and possession of as owner in fee. It is, then, a case within the very words of the statute, and, in my opinion, j ust such a case as the statute was intended to provide *for.
The defendant having purchased with full notice of the history of the title, apprised, as appears by the state of the case, of the demandant’s claim to dower, and having withheld a large portion of the purchase money, as an indemnity against that claim, ought not now to be permitted to deny the husband’s right to the land, any more than he would be to deny hip seizin, if he had received his deed directly from the husband himself.
The defendant either holds the land discharged of the trust, or subject to it. If the former, then he holds it under Yeo. If he does not, it may be worth his while, and that of his counsel, to consider whether he may not be called upon to account for the rents and profits to the cestui que trust.
It only remains to enquire, whether the alienage of her husband is any bar.to the demandant’s recovery.
Some, attempt was made, by counsel for the demandant, to avoid this objection, by suggesting that our statute does not require that, the estate must be such, as any issue the wife may have, mays by possibility inherit: that it only requires that the estate must, in its quantity.and quality, be of an inheritable nature. This suggestion, however, is based upon the mistaken idea that the statute has repealed the common law definition .of dower. *395 and introduced an entirely new rule upon the subject: that it is res integra, and is to be construed as if it was a statute creating a new right, and giving a new remedy. If this is true, and we are to settle the import of its enactments, irrespective of any preexisting rules of law upon the subject, — as if dower was created by this statute, and now given for the first time, — it will lead us to very extraordinary results: such, indeed, as would be astounding to the profession and the community. The words of the act would give dower of every estate of inheritance of which the husband was seized during coverture, although the issue of the wife could not by any possibility be heir. It would give dower of an estate in special tail, after possibility of issue extinct. It would give dower notwithstanding an ante-nuptial arrangement by settlement or jointure. It would give dower, perhaps, to the widow of the mortgagee, as well as of the mortgagor : nay, it would give dower to the widow of the trustee himself, as well as to the widow of the cestui que use, or cestui que trust, for the trustee is certainly seized of an estate of inheritance, and thus the widow of the trustee and of the cestui que trust, would both have dower. In short, I see no end to the difficulties that would result from an attempt to treat this statute as one abolishing the common law doctrine of dower, and introducing a new rule upon the subject. But in the construction of statutes, we must take words and phrases in the sense in which they are usually understood in the law, when applied and used in reference to the subject about which and to which the statute relates — a departure from this rule would involve us in inexplicable difficulties. If, for instance, the words “ for the term of her natural life, of the one full and equal third part ” had been omitted, in this statute, we should not have felt bound to give the widow the whole land, nor more than a life estate. We must have sought the meaning of the statute by enquiring at the common law the meaning of the word dower.
In reverting then, to the question, whether the alienage of the demandant’s husband is not a bar to her recovery of dower, I do not think it necessary to notice the very numerous cases and authorities, which counsel with great industry and ¿research, cited on the argument. The answer to the question must, it seems to me, depend upon the construction of our act concerning aliens, passed the 22d January, 1817, Elm. Dig. 6.
*396 The first section of the act of 1817, declares it shall be lawful for any alien, not the subject of any power at war, at the time of the purchase, with the United States, to purchase lands &c. and to have and hold the same to him, his heirs and assigns forever, as fully to all intents and purposes, as any natural born citizen of the United States may or can do. This section, per se, has clearly no effect upon the case, since the purchase was made before the act was passed. But the second section drops the distinction between an alien enemy and an alien friend, and declares that, all purchases made by “ aliens ” before the passing of that act, shall be deemed and held as good and effectual, to all intents and purposes as if the same had been made after the passing thereof.
Now, though a rigid adherence to the rule of the common law in relation to aliens; and perhaps too, a strict and critical construction of this act might justify us in saying, that the aliens referred to in the second section, must be restrained to mean alien friends; since alien enemies could not purchase after the statute, so as to hold to them, their heirs and assigns: yet it is more reasonable and consistent with the spirit of the times and the general policy of our State, to suppose, that by that statute, which was passed in a time of peace, the legislature intended to quiet and confirm all purchases that had theretofore been made by aliens of any description. I am the more inclined to this opinion from the incongruity that must result from a different construction of the act: for, by forcé of the first section, if an alien friend purchases to-day, and to-morrow becomes an alien enemy: continues so for years, and should even die in the ranks of the enemy; yet his children may inherit: Whereas, if the saving effect of the second section is not to be extended to prior purchases by alien enemies ; then it follows, that all purchases by such aliens, before the passing of the act, although they soon after became and continue to be alien friends, remain as at common law, liable to be defeated by office found, and their estates not transmissible by descent to their children. Nay, I do not perceive that; a subsequent citizenship conferred upon the purchaser, if he purchased while an alien enemy, could relieve, him from his disability of transmitting his estate to his children by descent.
It is true, the legislature had power to make such an unequal *397 enactment, if they thought proper. But it seems to be without reason and decidedly adverse to the enlightened and liberal policy of the age in which wre live, and we ought not to give such an odious construction to the statute, unless constrained to do so by its terms or manifest meaning.
The injustice of such a distinction will appear more striking, when we remember that, prior to the statute of 1817, alien friends and alien enemies, so far as respected their right to purchase, hold, sell and devise, until office found, stood precisely upon the same footing. The case of Fairfax’s Devisee v. Hunter’s Lessee, 7 Cranch, 619, 620, 621, shows that, at the common law, there was no difference between alien friends and enemies, in respect to their right to purchase and hold real estate until office found. Why, then, should the legislature say to alien friends, who bad purchased prior to 1817, you may hold and transmit your lands by descent to your children, although you may now be alien enemies ; but to such as purchased while they were alien enemies, your children shall not inherit your, lands, although you are now alien friends. And yet such will be the language in the operation of the act of 1817, if we limit the construction of the second section to the relief only of such previous purchasers, as were alien friends at the time of their purchase.
May we not fairly understand the meaning of the second section to be, that all purchases made by aliens, whether friends or enemies, previous to the passage of that act, should stand upon the same footing, as if they had been made under legislative sanction ? The act was passed in a time of peace, and such a construction would be, so far as I can perceive, consistent with the intention of the legislature. If any alien enemy has purchased since the act, he has done it, or if he hereafter purchases while the act is in force, he will do it with his eyes open ; and, with notice, that if he continues to hold, after he becomes an alien friend, and dies while he is such, he cannot transmit his estate by inheritance to his children. Whether even this restriction is wise or liberal, may be questionable, but it is not our province to decide.
Upon the whole, I am of opinion that if Yeo had died intestate, the owner of this land, his children, under a just and proper construction of the second section of the act of 1817, might have *398 taken the lands by descent, and consequently that the widow is entitled to dower.