IIorselower, C. J.
If the view taken by the judge at the Circuit, of the act making lands liable to be sold for the payment of debts, isacorrect, then it is immaterial whether the inquisition was properly rejected or not; and equally immaterial, so far at least, as this ease is concerned, whether the doctrine of escheats has any existence in this state. It is therefore necessa *34 ry in the first place, to inquire, whether lands can escheat to the state of New Jersey? And secondly, if lands may.escheat to, and thus become vested in the state, whether by force of any act of Assembly now in existence, they can be sold under an order of the Orphans’ Court, for the payment of the debts of the former owner; or for any other purpose.
Before proceeding however, to discuss those questions, I think it important to remark, that I apprehend the Circuit Court has fallen into an error of expression, in relation to the act making lands liable to be sold for the payment of debts; and into a misconception of the consequences of an escheat, as affecting the rights and interest of creditors, and cestuis que trust. The judge spoke of the act making lands liable to be sold for the payment of debts; as an act, making them liable to be sold “ in the hands of the executor and administrator." This was at least an inaccurate form of expression. There is no such act in this state; nor are lands, by force of any statute, in any sense, in the hands of nor subject to the control of executors or administrators. They are not assets in their hands; but, in certain cases, they may be made, or converted into assets for the payment of debts, by a decree of the Orphans’ Court. It would have been much more correct to have spoken of the act, as one making lands, in the hands of the heir or devisee, liable to be sold for the payment of the debts of the ancestor, or testator; and such was evidently, and as I think, exclusively the design of the legislature.
Again, the judge inquired, why creditors should be barred of their debts, and the state be permitted to take the whole of the fund, upon the faith of which credit had been given, freed and discharged from all debts and trusts whatsoever, merely because the debtor had died leaving no heirs capable of inheriting his estate? This was certainly putting the question in a very plausible form, and in one that could not fail to extort from a popular tribunal, the prompt and decisive reply, that there ought not to be any such law. It might be equally influential perhaps, in an action brought by an individual against the state, to put it to a jury to say, why, the state ought not to pay its debts, and perform its contracts; and if it refused to do so, why it should not be sued, like any other individual or corporation ? I do not see why such a question would not suggest as good an argument for *35 maintaining a suit against the state of New Jersey, before a justice of the peace, or in any other court of law, as it does for permitting the lands of the state, to be sold under an order of the Orphans’ Court, unless there is some statute authorizing such an anomaly. I greatly rejoice that our statute book is yet exempt from such an enactment.. But all such questions are suggested by an unwarrantable assumption, that the government will do injustice; an event that courts ought not to anticipate, and then make that anticipation the basis of a judicial decision.
In the spirit of the inquiry made by the Circuit Court on the trial, one of the counsel at the bar, asked whether the state of New Jersey, is to take the lands, in ease of escheat, discharged of all debts, and legal incumbrances or equitable liens? To that question I would give the general answer, no : but then I would explain myself, by saying that the state takes the lands, without being subject to any common law, or other process by which it could be sued; hut yet, subject to such debts, liens and trusts, in the highest and most compulsory sense; in precisely the same sense, in which we say the state is liable for the payment of its debts ; and that it cannot take private property, for public purposes, without making compensation to its owners. We do not by such language mean, that the state has not the physical power, or that it can bo restrained or coerced, by process out of any court; but that by the eternal and immutable principles of justice, it ought not to do so ; and then comes in the presumption, that it will not; and that presumption is law; nay it is equivalent to fact. We are not at liberty as a court of justice, deriving our authority from the government, to imagine it possible, that the state will refuse to pay its debts; or that it will do injustice to any individual; and then in view of that possibility, step in and arrest the arm of the sovereign authority, and do by judicial action, that which we think the state ought to do, but which we fear it may not, or will not do, if left to its sovereign will. I do not know, that the crown of England, with ail its prerogatives, has failed to do justice to those, who have had just and equitable claims upon escheated property; and much less has the state of New Jersey, by its legislation, given occasion for any fears, that it will appropriate to its own use, what belongs to the widow, the orphan or the honest creditor. Nay, in *36 relation to this very property, it has already relinquished its title in favor of those claiming consanguinity to Leake; and its only object has been to take care of it for the benefit of such as might have just and equitable claims upon it.
It would be a little singular, if with our statute before us, entitled, “an act concerning escheats,” Elm. Dig. 162, we were now gravely to enter upon a discussion of the question, whether the doctrine of escheats could be recognized in this state. It has been suggested indeed, that the lands in New Jersey, of a person dying intestate, and without leaving any person capable of inheriting the same, revert to the proprietors. If there is the slightest foundation' for such a suggestion, it will be time enough to discuss it, when such a claim shall be interposed. But the legislature have asserted the rights of the state on this subject; they have assumed the existence of title in the state by escheat, and have prescribed the manner, by which, through the instrumentality of its attorney general, and the courts and officers of the staté, lands which have escheated, may be reduced to actual possession, and its value in money be ultimately brought into the treasury. But the doctrine of escheat, was not denied by the counsel for the defendant in error. On the contrary, they admitted that upon the death of a man, without heir or devisee, the title to his lands, eo-instanti, and before office found, vested in the state. So undoubtedly is the law. Den v. Redfern, 12 East 96, 112; Johnson v. Hart, 3 Johns. Cas. 325 ; 3 Cruise Dig. 491, tit. 30; 6 Johns. Ch. R. 365; 3 Johns. Cas. 109; Jackson v. Adams, 7 Wend. R. 369. But then they endeavored to sustain the ground taken at the Circuit Court, that by force of the act of 1799, and the supplements thereto, lands which have escheated to the state, are liable to be sold by order of the Orphans’ Court for the payment of debts. Upon this point however, I find myself compelled to dissent from my brother, who presided at that trial. The history of legislation in this state, on the subject of the sale of lands for the payment of debts, was given by Chief Justice Ewing, in Den v. Hunt, 6 Hal. 1. By the eleventh section of an act passed in 1784, establishing the Orphans’ Court, that court was authorized to order a sale of lands by executors &c. to pay debts, and maintain children; and by the twelfth section, it was declared, that the deed to the purchaser, under such an *37 order, should coiive)'' all the estate the testator or intestate was seized of in such lands, at the time of his death. But these sections of the act of 1784, were repealed by the act of the 18th of February, 1799, which renewed the authority of the Orphans’ Court, to order a sale of lands, for the payment of debts; but expressly declares, (in the 22d section,) that the deed, made in pursuance of this order, shall vest in the purchaser only such estate as the heirs or devisees, were seized of, at the time of making the order. In the case of Den v. Hunt above cited, Chief Justice Ewing, speaking of the power given to the Orphans’ Court over real estate, says, “ it being special and given by statute, it must consequently be limited by, and co-extensive with the provisions of the statute.” In that case too, the Chief Justice repudiates the doctrine of a lien, which, as has been done in this case, had been strenuously urged by counsel, and proceeds at some length to expose the entire fallacy of the argument. H No such lien,” he says, “ in a strict or technical sense, exists. The personal estate is, and the real estate may be made assets; but neither is, technically speaking, under a lien ; neither of them becomes, by the death of the owner, subjected to a pledge or mortgage for the payment of debts.” But it is said that the case of Den v. Hunt, although it was not decided until 1829, depended upon a state of facts that arose prior to the passage of the act of 1825; and that by the very terms of that act, Elm. Dig. 493, the debts of every decedent are made a lien upon his lands. This I respectfully insist, is a mistake. Under the act of 1799, it had been held, in the court of Chancery, in the case of Parret v. Vanwinkle, (in which I was of counsel,) cited by Chief Justice Ewing, in Den v. Hunt, 3 Hal. 9, that a bona fide purchaser or mortgagee of the heir or devisee, could not be defeated by a sale and conveyance made under an order of the Orphans’ Court. To remedy the law in this respect, the act of the 12th of December, 1825, was passed ; and its object was to tie up the lands of a decedent for one year; so that at any time within that period, an order might be made for their sale, which should be effectual against any sale or incumbrance that might be made by the heir or devisee, within that period. This act was so unskilfully drawn, or at least so ambiguous in its terms, as to render it doubtful what estate a purchaser acquired under such a sale; and *38 also, whether the power of the Orphans’ Court to make an order for sale was not limited to one year. To obviate this difficulty, the legislature, by the third section of a further supplement, passed the 14th November, 1837, have enacted, that if the order shall be made within one year after the death of the owner, the purchaser shall have all the estate the testator or intestate had in the premises, at the time of his death; but that if the order for a sale, shall not be made within the year, that then the purchaser, shall only have such estate in the premises as the heir or devisee, had therein at the time of making the order. But this act can have no influence on this case. I am at a loss therefore, to conceive how the act of 1825, can be construed as creating a permanent lien on the lands of every decedent, for the payment of his debts. So far from it, the general words of the act, are limited to the period of one year, by the act itself. Its language is, that “ the lands &c. of any person, who shall die seized thereof, shall be <¡md remain liable for the payment of his debts, for one year after his deceaseand the act then proceeds to say, such lands may be sold, by order of the Orphans’ Court, if such order be obtained within that period, notwithstanding any alienation or incumbrance made by the heirs or devisees.
By what authority then did the Orphans’ Court make the order for sale in this case, nearly eight years after the death of Leake and after the State had taken possession of the lands ? Even if the act of 1825, makes lands which have escheated to the state, liable to-be sold for the payment of debts; yet by the very words of the act, they are made liable, only for one year after the death of the testator or intestate; and then, only upon condition that the order shall be obtained within that period. • ,
But again, and I ask the question, with solicitude for purchasers under such sales if they should be repeated, whose and what estate did Townsend buy at this sale ? Certainly not the estate of Leake. By the act of 1799, the deed made in pursuance of an order of the Orphans’ Court, conveyed only such estate, as the heir or devisee had in the premises, at the time of making the order. Parret v. Vanwinkle, in Chancery; Den v. Hunt, 6 Hal. 1 ; Skilman v. Van Pelt, Sax. Ch. R. 511. Nor did the supplement of 1825, make any alteration in this particular. Even if an order could have been made under that act, af *39 ter the expiration of a year, the purchaser could only have acquired such title or estate as the heir or devisee had, at the time of making the order. But in this ease, there was no heir or devisee, and consequently no estate in any heir or devisee; and the estate was and had been from the instant Leake died, in the state of New Jersey, and I know of no law authorizing the Orphans’ Court, to order a sale of lands belonging to the state; nor in my opinion, can the title of the state be defeated or divested, but by an express act of legislation for that purpose.
There is, as I have already shown, no such law or doctrine in this state, as that upon a man’s dying, all his lands become bound or pledged indefinitely for the payment of his debts. They are bound only, or rather are liable only for one year ; and after that only so long as they remain in the hands of the heirs or devisees. The judge however, in his charge to the jury, said there was no exception in the statute, in favor of the rights of the state; and that the same rule was applicable to all lands, whether descending to the heir, or escheating to the state. In answer to this, I beg leave to say, it was not necessary, in express terms to save the rights of the state ; because there was nothing in the statute, either in terms or by construction, affecting those rights. Whoever will take the pains to read the several acts upon this subject, will see, that the whole scope and design of legislation in regard to it, was to give to creditors a remedy against the lands of their debtors, in the hands of heirs and devisees ; that the legislature never contemplated the sale of lands which should es-cheat to the state, and that all the provisions of the statute, have reference to lands, which have descended, or been devised. I will refer only to some of the details as proof of this. By the nineteenth section of the act, Elm. Dig. 486, the court are to make an order, requiring all persons interested, to show cause &c. and then the court are to hear the allegations and proofs, of the executors or administrators, and of the persons interested. But when lands have escheated to the state for want of heirs or devisees, who are the persons interested ? Who will, or who has a right to interfere and oppose the sale, as unnecessary; or to except to the administrator’s accounts as erroneous or unjust? Recent events which have transpired in this court, in relation to this very estate, show how necessary it is that there should be *40 somebody to look into such proceedings. Again, the rights and interests of the heirs and devisees, are to be consulted on the question of selling the whole or a part only of the lands ; and the surplus money is to be distributed among the heirs and devisees. It is not indeed very likely, that when lands that have escheated to the state shall be sold in this way, that there will be any surplus; but if there should be, what is to become of it? Again, when lands are thus sold, the statute provides for contribution among heirs and devisees: and by the act of 11th December, 1823, Elm. Dig. 492, the court after an order for sale, are to decree distribution of the surplus, among the heirs and devisees; but the court have no authority to order any surplus to be . ild to the State Treasurer. In short, all the provisions of the statute have reference, to lands descended or devised, and to no other.
But again, in a statute like this, intended only to give personal remedies, and to secure and regulate private rights, if the language was broad enough by construction to embrace the state, yet its rights would not be affected by it. The state is not bound by statutes regulating private rights, unless there are express words to that effect, or a necessary and unavoidable implication arising from the language employed in the statute. 1 Bl. Com. 261; 2 Mason’s R. 311. But in my opinion, it would be against public policy and private security, to authorize the Orphans’ Court to order a sale of lands which have escheated to the state. This very ease affords a striking commentary on such a practice. A foreigner comes into our state and purchases a valuable farm; he has a wife and children in Europe, whom he intends to bring hither; but death overtakes him before he can effect his purpose; a stranger as in this case, having no claims upon the deceased or his property, gets administration, trumps up an account, and under an order of the Orphans’ Court, obtained upon an ex parte application, sells the whole estate to pay debts, when it is manifest upon the face of his own account, that he had not one dollar of debt to pay. Is it not better that the state, as guardian of such property, should take it under its care, and see that it is applied to the payment of debts, if any, and the surplus, be given to the widow and children of the deceased, or to such persons as by the ties of nature and consanguinity would be best entitled to it ?
*41 But in my opinion the Orphans’ Court have no power to order a sale of lands that have escheated to the state, and consequently if Leake died without making any devise of the premises, and without any heirs at law, the proceeding was coram non judice, and the plaintiff derived no title under it.
Nobody has any right to complain of hardship in this case. The administrator, the orphans’ court, and the purchaser, all acted with their eyes open. Leake died in 1827, an inquest was taken in 3 832, and the order for sale was made in January, 1835, and not until after the state, by its agent had taken possession of the property. The proceedings on the part of the state were matter of record, and notice to all the world.
I am of opinion also, that the inquest was improperly overruled. It is true, the inquest had not been followed up by the Attorney General, and final judgment entered thereon. But this was not necessary, as against Van Kleeek, the lessor of the plaintiff, nor as against any one else seeking to recover possession of the land. If the action had been on the demise of the state against Van Kleeek; or if O’Hanlin had been plaintiff, claiming title under the state, and seeking to turn Van Kleeek out of possession, it would have been a very different thing. In either of those cases, the plaintiff would have been obliged to show not only an inquisition, but a regular judgment, by default, or upon a traverse taken to the inquisition. But in neither case would such evidence be conclusive, unless the defendant in the suit, had himself traversed the inquisition and thereby made himself a party to the record. Stokes v. Dawes, 4 Mason's R. 268 ; and see also the cases and authorities above cited. The inquest then, so far as it went, was complete ; it was a record, and therefore competent evidence, though not conclusive, to show that Leake had died intestate as to the land, and without heirs capable of inheriting it, and ought therefore to have been admitted.
For these reasons, I am of opinion, the judgment of the Circuit Court ought to be reversed.
Elmer, J.
The Circuit Court charged the Jury; that whether the lauds, escheated to the state or not, upon the death of Leake, they remained chargeable with the debts of Leake, and *42 subject to the same law, and to the authority and jurisdiction of the Orphans’ Court,'as all other lands are, and there was not any thing in the objection taken by the defendant, that the Orphans’ Court had no authority to order a sale. This part of the charge is excepted to by the plaintiff in Error. It is admitted, that all the power or jurisdiction the Orphans’ Court has, to order a sale of lands of a deceased person, is derived from the several statutes upon that subject. And the question on this part of the case is, whether, when a debtor dies owning real estate, intestate and without leaving heirs to inherit the same, the Orphans’ Court has any power to direct a sale of his real estate for the payment of his debts. In the course of the argument, the counsel of the plaintiff, seemed to consider the question to be, whether in such case, the íand escheated to the state, clear of all debts of the deceased, which is not the question.
The act of 1799, makes it the duty of an executor or administrator, when he shall discover or believe, that the personal estate of the deceased is insufficient to pay his debts, to apply to the Orphans’ Court of the county where the lands lie, for aid in the premises; upon which application the Court make an order, directing all persons interested, to appear &c. to show cause why so much of the lands of the deceased, should not be sold as would be sufficient to pay the deficiency. At the time and place appointed, the Court are to hear and examine the allegations of the executor or administrator and other persons interested, and may make an order for the sale of the whole or a part; and the surplus money arising from such sale, shall be distributed among the heirs.or devisees, according to the law of descents, or the will of deceased. An(i the heir or devisee where land is to be sold, may compel all others claiming or holding under such intestate or testator, to contribute in proportion to their respective interests, so as to equalize the burthen or loss. Again, the executor or administrator, after making the sale, is to execute a deed to the purchaser, which shall vest in him, as good and perfect an estate in the premises sold, as the heirs or devisees of deceased were seized of or entitled to &c. The money arising from such sale, is made assets for the payment of debts, and the surplus,-if any, distributed' among the heirs or devisees in the proportion before mentioned.
*43 By the act of 1823, the court is authorized when a sale of land is directed, to require bonds of the executor or administrator with special condition &c. And after the executor or administrator shall have accounted for the sale, the Orphans’ Court are to order a just and equal distribution of the surplus, among the heirs or devisees, to whom the lands sold descended or were devised, according to the law of descents in the former and the will of the testator in the latter case. By the act of 1825, the real estate of any person, who shall die seized thereof, or entitled to the same, shall remain liable for the payment of debts, for one year after the decease of the debtor, and may be sold by virtue of an order of the Orphans’ Court, if obtained within that period of time, any alienation or incumbrance made or intended to be made, by his or her, heir or heirs, devisee or devisees to the contrary notwithstanding.
It is by virtue only of the acts cited, that the Orphans’ Court, upon the petition of an executor or administrator, have any right to order a sale of land; and they all contemplate the death of the owner, having left heirs or devisees. The estate to be conveyed by the executor or administrator is the same, the heirs or devisees bad. What estate or interest is to be conveyed, when the deceased owner had neither heir nor devisee ? And what is to become of the surplus, where there is no heir or devisee to receive it ? And bow can there be any contribution where there are neither heirs nor devisees f The question is not, whether the land remains liable to the debts of the deceased, but whether the Orphans’ Court have authority to direct a sale. If there was no statute, the court would have no authority to direct a sale in any ease. If the legislature, have not included the case of a person dying without heirs or devisees within the jurisdiction of the court, this court cannot supply the omission. Suppose Leake to have died without heirs or devisees, it does not seem to me to follow, because the lands escheated to the state, therefore they are to be free from bis debts, but it may change the course of collection. It is not necessary however, to determine that point now. I am of opinion, if, Leake died intestate, and without heirs, the Orphans’ Court had no power or authority to order and decree a sale of the premises in question, for the payment of his debts. The court had no jurisdiction over the land, and it was com *44 petent for the defendant to show, on the trial of the action of ejectment, such fact. And consequently this part of the charge of the court is contrary to law.
The doctrine of Escheat, is thus stated by Chief Justice Kent, in the fourth volume of his Commentaries, 423, “The title of Es-cheat, in the English law, was one of the fruits and consequences of feudal tenure. When the blood of the last person seized became extinct, and the title of the tqnant in fee failed from want of heirs, or by some other means, the land resulted back, or reverted to the original grantor, or lord of the fee, from whom it proceeded, or to his descendants or successors. But as the feudal tenures do not exist in this country, there are no private persons who succeed to the inheritance by escheat; and the state, steps in the place of the feudal Lord, by virtue of its sovereignty, as the original and ultimate proprietor of all the land within its jurisdiction. It is a general principle in the American law, and which I presume is every where declared and asserted, that when the title to land fails from defect of heirs, it necessarily reverts or escheats to the people, as forming part of the common stock to which the whole community is entitled. Whenever the owner dies intestate, without leaving any inheritable blood, or if the relations he leaves are aliens, there is a failure of competent heirs, and the land vests immediately in the state by operation of law. No inquest of office is necessary in such cases. It is a principle which lies at the foundation of the right of property, that if the ownership becomes vacant, the right must necessarily subside into the whole community in whom it was originally vested when society first assumed the elements of order and subordination.” When an alien who holds land dies, at common law it instantly and of necessity without any inquest of office, escheats and vests in the state, because the freehold cannot be kept in abeyance, and he is incompetent to transmit by hereditary descent. The law, never casts the freehold upon an alien heir, who cannot keep it. 7 Wend. 368, and cases cited. 8 Mass. Rep. 445; 7 Cra. 603.
The statute concerning Escheats, passed February, 1828, after the death of Leake, recognizes the title of Escheat in the State, and seems to have been passed merely for the purpose of ascertaining the' facts necessary to constitute such a title, and *45 to provide a mode of sale and conveyance of the land escheated, by the state. Immediately upon the death of Leake, if ever, the title to the land vested in the State, without these proceedings.
If the Orphans’ Court had no jurisdiction to decree a sale of the land in question, their decree is void. The defendant may show in this collateral action, the want of jurisdietion, and power of the court to order a sale, and it was necessary for him, to do so, in order to defeat the title of the plaintiff. He did give some parol evidence on the trial, to show that Leake died without heirs, capable of inheriting the land in question ; and further offered in evidence, an exemplification of certain proceedings in Chancery under the act concerning Escheats, and an inquisition finding the decease of Leake without heirs, which was objected to and overruled by the court, and this is also assigned for error. I think the evidence was competent. It was some evidence. 1 Phillips Evid. 374.
I am of opinion, the judgment of the Circuit Court should be reversed.
White, J. concurred in reversing the judgment.
Neyxus, J.
The plaintiff in error contends that upon Leake’s death without lawful heirs, his lands escheated to the state, and that the Orphans’ Court had no jurisdiction over them, and no right to decree a sale, and consequently all the proceedings in that court relating to the premises were null and void. In determining this question, we are to consider the doctrine of es-cheats, the principle upon which it rests and its applicability to our form of government and the general policy of our laws. In England it is a branch of the royal prerogative and had its origin in the feudal tenures, based upon the maxim, that all lands were held mediately or immediately of the crown and for defect of heirs of the tenant, reverted on his death to the King. By virtue of this prerogative and at common law, it is said he took the lands escheated, freed not only from the debts of the last owner, but even from all trusts. However true this may be in theory, the exercise of this right was esteemed harsh and unjust and it has therefore been the practice for the crown on petition disclosing the facts, to grant the lands to the relatives or family *46 of the deceased owner and to direct the execution of trusts and this practice has been sanctioned and regulated by act of parliament. Chitty’s Roy. Pre. 235.
But whatever may be the principle upon which the doctrine of escheat is founded in England, or by whatever rules it may there be governed, I apprehend it is founded here upon a different ground. Blackstone says, it is adopted in almost every country to prevent the robust title by occupancy from taking place, and Kent in his commentaries says, it is a general principle in American law, everywhere declared and asserted, that when the title to land fails from defect of heirs, it necessarily reverts, or es-cheats to the people, as forming part of the common stock, to which the whole community is entitled. Whether it exists here by virtue of the necessity or policy referred to by Blackstone, or by virtue of the general principle mentioned by Judge Kent, it is clear, that it does not arise from the feudal tenures, or from any breach of the original condition implied in a feudal donation, which Bracton calls, a species of reversion ; and therefore we are noi constrained to adopt it, with all its rigid consequences, as it exists in England, but only in such a qualified form as is consistent with natural justice, and the policy of our laws. If we had no statute which affected the lands of a person dying without heirs, or the rights of a creditor to have them sold for the payment of debts, I should nevertheless be of opinion, that the state took lands escheated, subject to the debts of the last owner. The state cannot by virtue of any delegated power to her, deprive her citizens of their just rights, without a violation of her most sacred obligations to protect them. There is neither occasion nor propriety in resorting to a royal prerogative right, with all its harsh and oppressive features and consequences, to find an owner to real hstate and thereby deprive the cestui que trust of his beuficiary interest and the creditor of his just and honest claim. And it is no satisfactory answer to say, that the law presumes the state will do right. Experience has shown, that an appeal to the justice of the legislature is often dilatory, expensive and sometimes an uncertain remedy for just and equitable demands, and the general policy of our government is to define the rights of the citizen with certainty and precision, and enforce them by certain fixed and settled principles. Nothing *47 should he left to mere discretion and an undefined sense of justice, that can be determined by a settled rule.
But even if I am in error in the view I have taken of this doctrine of escheat as it exists here, by common law, I apprehend that the several acts of the legislature making lauds liable for the payment of debts, do, in their provisions embrace as well the lands of a person dying without lawful heirs, as of one who leaves heirs. Long before the revolution, it was the policy of the government, to subject lands to the payment of the debts of the owner. In 1743, the legislature declared, that it was reasonable and just, that the real estate of every person should be subject to his debts, and by act of that year, lands were made liable to be sold on a judgment and execution against the owner, and by construction of that act, were adjudged to be subject to a judgment and execution against his executors or administrators.
In 1784, by another act, executors and administrators were enabled on a deficiency of personal estate, and by virtue of a decree of the Orphans’ Court, to sell the real estate of their testator or intestate for the payment of his debts, and the twelfth section declared, that the purchaser at such sale, should be vested in as good anjl perfect an estate, as the owner^of such lands was seized of at the time of his decease. This latter provision was altered by the twenty-second section of the act of 1799, Elm. Dig. 490, which declares, that the title so made by the executor or administrator, shall vest in the purchaser as good and perfect an estate in the lands, as the heirs or devisees were seized of or entitled to at the time of the decree of sale by the Orphans’ Court. The manifest design of this alteration was to protect innocent purchasers, who had acquired title from the heir or devisee before the action of the Orphans’ Court, and not to free or exempt the land from the just debts of the owner, where the heir or devisee had made no conveyance or created no incumbrance upon them. The great object of the legislature, to be gathered from the scope of this act of 1799, was not only to give to the executor or administrator a right, but to make it his duty to appropriate the real estate of the deceased owner of lands, to the payment of his debts, in case the personal estate was insufficient for that purpose. The language of this act in regard to the lands to be sold for the payment of debts, is broad and comprehensive, *48 “any executor or administrator who may find the personal estate of his testator or intestate insufficient for the payment of his debts,” (not excepting the administrator of a person dying without heirs,) shall proceed and make sale by decree of the Orphans’ Court. And although when speaking of the title which is to be given, they declare it to be the title of the “ heir or devisee,” these terms by fair construction, and to preserve the consistency of the act and to carry out the clear design of the legislature, may be construed to extend to that owner upon whom the inheritance of the lands may descend or in any otherwise be cast-after the death of the debtor. But in 1825, the legislature by another act, declared that the lands of a deceased owner should remain liable for his debts for one year, notwithstanding any incumbrance or alienation by the heir or devisee. Thereby making the debts a lien upon the lands, for that period at least-, in the hands of the executor or administrator and preventing the heir from aliening or incumbering them to the prejudice of the creditor. The act of 1837, provides that the conveyance by the administrator shall vest in the purchaser the title of which the intestate was seized at his death, if the order for sale was obtained within the year, or if obtained after the year, then the title of the heir.
Thus it will be seen that for the last century, it was the general policy of the government, to make lands chargeable with the debts of the deceased owner, and since 1784, the Orphans’ Court had jurisdiction to decree a sale of all lands for the payment of debts where the personal estate of the deceased was insufficient. This is a just policy designed for the security of creditors, and for the interest and welfare of the public, and the statutes being remedial should be liberally construed to effect the object intended.
- But it is contended, that however comprehensive the language of these several statutes may be, yet that the state, or the rights of the state, cannot be affected by them, because not named by special and particular words, and we are referred to the principle, “ that the King is not bound by act of parliament unless expressly named.” Without inquiring how far this principle of royal prerogative is applicable to our republican form of government, I remark, that it is not true in the broad sense contended *49 for in the argument. The learned commentator whose authority is cited in support of the principle, says that where an act of Parliament is made expressly for the preservation of public rights, or the suppression of public wrong and does not interfere with the established rights of the crown, it is as well binding upon the King as upon the subject. And Lord Bacon lays down the principle, that the crown is bound by the general words of a statute made for the maintenance of religion or the support of the poor, because statutes in which the public are interested should be so construed as to be effectual. Mr. Chitty in his work on the prerogatives of the crown, says that there are important exceptions to the general rule, “ that the King is not bound by the general terms of a statute,” and he instances a variety of these exceptions. He is impliedly bound by the statutes passed for the public good, the relief of the poor, the advancement of religion, learning, and justice, and the prevention of fraud,-injury or wrong. Chit. Roy. Pre. 382. What could be more unjust and injurious, than that the real estate of a debtor should pass into the public treasury freed from the debts of the owner ? It is true, that the general statutes of limitation, bankruptcy, insolvency and set-off, have been considered as inapplicable to the claims of the crown and have been adjudged not to bind the state, but this arises from a different principle. It is upon the presumption, that the King is employed in the affairs of government, and therefore ought not to suffer by the negligence of his officers. In a representative government, where the people do not or cannot act in a collective capacity, but only through their representatives, the reason for the rule is equally cogent. 18 J. R. 228.
My opinion therefore is, that the State does not take lands by escheat, by virtue of any reversionary right, and freed from the debts of the last owner, and that the lands escheated are subject to the same laws that regulate the sale of all other lands that may be devised or descend to the heir. And that the Orphans’ Court had jurisdiction in this case, and a legal right to decree a sale of the lands in question for the payment of debts. Entertaining this view of the case and that the testimony offered was immaterial to the issue and rightly rejected, it becomes *50 unnecessary to determine the second objection taken to the inquisition.
Another objection was urged upon the argument against the validity of the proceedings of the Orphans’ Court. The petition of the administrator sets forth, that the personal estate of the intestate was insufficient to pay debts and expenses, and in the recital to the decree, the Court says, “ that it appears that the personal estate is insufficient to pay just debts and expenses,” &c. As the statute empowers that court to decree a sale of lands where the personal estate is not sufficient to pay debts, it is insisted that the proceedings on their face show a want of jurisdiction, and therefore,, that the decree is a nullity. That the word expenses vitiates and avoids it. The Orphans’ Court is one of general jurisdiction and its judgments and decrees within that jurisdiction, however irregular, are conclusive till reversed. As this question has been fully considered by this court in Den v. Hammel, 3 Har. 74, I deem it unnecessary to add any thing further, than to say the .objection is not sustained. I think the judgment of the Circuit Court should be affirmed.
Whitehead, J.
Although the order of the Orphans’ Court under which the sale in this case was made, was irregular in decreeing a sale for the payment of expenses as well as debts, and would for this cause, have been reversed upon Certiorari, yet until reversed, it is valid. The case of Den v. Hammel, 3 Har. 73, is decisive on this point.
I am also of opinion, that the Orphans’ Court had jurisdiction, and that the sale is good, notwithstanding the alienage of the kindred of the intestate, and their consequent incapacity to take as his heirs.
In this state the land of an individual dying intestate leaving no persons capable of inheriting, escheats to the state; but I cannot bring my mind to the conclusion, that under our laws subjecting lands to the payment of debts, the State takes them discharged from the debts of the intestate. Such a construction is opposed to the whole scope and policy of our laws upon this subject. Whatever may have been the construction of the old act of 1799, it is manifest that the act of 12th December, 1825, has introduced a new rule. It provides that the lands &c. of any *51 person who shall die seized, shall be and remain liable for the payment of his or her debts, for one year after his or her decease, and may be sold by virtue of an order of the Orphans’ Court. Before the passage of this act, and under the construction given to the law of 1799, the real estate of a deceased debtor could not be reached by an order of the Orphans’ Court, if aliened- by the heir or devisee before the order was obtained. The evident intention of the legislature by this act was, to create a lien on the lands for the payment of debts for one year, and for a longer period unless aliened by the heir. There is no exception in the act. It is general in its terms, and embraces the case of every person dying seized. A sale under this act would convey to the purchaser the estate which the deceased had in the lands at the time of his death, for the reason, that from that period the lien attaches and his lands become chargeable.
Although it is doubtful whether the legislature contemplated a case of this kind at the time of the passage of the act, yet it is manifest from its general terms, that they designed to create the lien upon the lands of every person who might die seized, without any exception. If this be not so, then it follows, that the Orphans’ Court before making an order for sale, and a purchaser before he ventures to buy, must ascertain whether the lands of the deceased have not escheated, or in other words whether the lien of creditors for the payment of their debts is not destroyed by reason of the alienage of his heirs. This cannot be under the broad provisions of this law.
If my views upon this point are correct, then the inquisition taken before the sheriff was entirely irrelevant, and the Court was right in rejecting it.

Judgment Reversed.

Cited in Haines v. Price, Ex., Spenc. 486; Affirmed, 1 Zab. 582 ; Colgan v. McKean, 4 Zab. 575.